**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**BECKERICH, CHRISTY,**                                    **PLAINTIFFS**
**INDIVIDUALLY AND AS**
**CLASS REPRESENTATIVE,**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MEGHAN BENTLE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MORGAN BISHOP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHRISTA BOWDLER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**REBECCA BRAUNWART**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EILEEN BRINKMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIM BROWN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA BURG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**STACEY CALDWELL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER CARLTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VERONICA CRUMP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CARRISA DAUGHERTY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**NICHOLE DOYLE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DEANNA DUDLEY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA HALKIOTIS**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**APRIL HOSKINS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MALIZA JACKSON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TIFFANY JUSTICE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HEATHER KING**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RONALD KLOTZ**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SUSAN KLOTZ**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**AMY LEMKER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TIFFANY MANNING**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ELIZABETH MOZEA**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**LISA MULDOON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GARY MYERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JOY PATRICK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANGELA PERIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KELLY REYNOLDS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VALERIE ROSE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SENECA SHELDON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MONICA SMITH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHRISTINA STAFFORD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DEELA STURM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**PHILLIP VAUGHT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MAJA VICKERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GRETA WESTERMEYER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ISABELLE WIEHE**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**MELISSA WILLS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**WILLIAM WRING**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RICHARD BRIGGS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**NATALIE CUNNINGHAM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EMILY DOWDEN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JAMIE DOWNTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIMBERLY DUTZE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DANIELLE FORMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHAUNA FREIBERGER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHANNON FREY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MELINDA GRIESMANN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHELLEY HAAS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JOYCE LIFE-ISHMAEL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HOPE LOVE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHERYL MACKLIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TRACY MALLERY**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DAWN MALONE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KAREN MANTER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHANNON OSTERFELD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER PHILLIPS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MICHAEL SAAL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SUZANNE THOMAS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**BRENDALEE TRAVIS**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**TRICIA WILLIAMS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**THOMAS WRIGHT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**BRITTANY YOUNG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MARK YOUNG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TRACEY DURROUGH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TAMMY HARDIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHANNON HEEG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EMILY HEFFNER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHELLY KELLER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER KOENIG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TONYA LANHAM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**OLIVIA LIGGETT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JULIE MYRICK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNY NEISER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VALERIE PATRICK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHAWNEICE PERNELL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KEA PETERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MICHELLE PIERCE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**STEPHANIE PORTER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**LARA REEVES**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SUSAN STREICHER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SANDRA SUMME**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**LATONYA WILLAMS**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**JAMES ALLEN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DARRIS BOHMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DAWN BOWMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MICHAEL BROCK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RONNIE BROWN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ELISSA BUONPANE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HEATHER BYNUM**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ARIEL COLWELL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHASTITY DONK**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DANIELLE FORMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JANET FRITSCH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JOSEPH GREER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANGELA HICKS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ABIGAIL HILTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**PAULA JUMP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MICHELLE MORATH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA MORENO**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VICTORIA MORSE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DESIREE OCHS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TODD PETERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**STEPHANIE PHELPS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SARAH REED**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RAENNA ROTH**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**BRIAN SCHMADEL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SAMANTHA SHANNON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIMBERLY SHROUT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER SIDERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MARCIE STAHL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHANNON STORM-SIEG**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DONNA TIDBALL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JESSICA WALKER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TAYLOR WILSON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**REBEKKAH WINKLER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GLENDA ANDERSON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GLENN BEIER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CAROLINE CIEMINSKI**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DONNA CRASE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ALAINA DAVIS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**LESLIE DAVIS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TAMRA ELDERS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GREG ELLINGTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RON GERDES**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**REBECCA GERREIN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HANNAH HEILMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TONI IACOBUCCI**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**EMILY MADONIS**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**LINDSAY MCFARLAND**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JENNIFER MILLER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**AUSTIN MONTANEZ**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JILL PABST**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**AMANDA PRESTON-CLAPPER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**HEATHER RAPP**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIM RUEDEBUSCH**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CONSTANCE SHEPARD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ABIGAIL STEDMAN**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TAYLOR STEWART**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MARY TOENNIS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**KIM WOOLUMS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**BRITTANY ALDRIDGE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MATTHEW BARKIMER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RACHEL CAMPBELL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JAMES COOPER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**GEMMA DEPPERSCHMIDT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**JOSEPH GREER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**SHELLEY HAAS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA HARB**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DUSTIE HOGUE**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**VANESSA JOHNSON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**TERESA LYNCH**
**5247 MADISON PIKE**

**INDEPENDENCE, KY 41051**

**AND**

**JEANIE MILLS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**RONDA MONTANO**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CRYSTAL NAPIER**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**CHRISTINE O'NEILL**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**DAVEE PENNINGTON**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**ANDREA SELLARS**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**NANCY VANPELT**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**AND**

**MINDY WIEDERHOLD**
**5247 MADISON PIKE**
**INDEPENDENCE, KY 41051**

**v.**

**SAINT ELIZABETH MEDICAL CENTER, INC.,**                    **DEFENDANTS**
**ATTN: LISA FREY**
**ONE MEDICAL VILLAGE DRIVE**
**EDGEWOOD, KY 41017**

> **SERVE: ROBERT M. HOFFER**
> **207 THOMAS MORE PARKWAY**
> **CRESTVIEW HILLS, KY 41017-2596**

**AND**

**SUMMIT MEDICAL GROUP, INC. d/b/a**
**ST. ELIZABETH PHYSICIANS**
**7370 TURFWAY ROAD**
**FLORENCE, KY 41042-4896**

> **SERVE:  Robert M. Hoffer**
> **207 Thomas More Parkway**
> **Crestview Hills, KY 41017-2596**

**AND**

**CINCINNATI CHILDREN'S**
**HOSPITAL MEDICAL CENTER**
**3333 Burnet Avenue**
**Cincinnati, OH 45229**

> **SERVE:  FRANK C. WOODSIDE III**
> **1900 CHEMED CENTER**
> **CINCINNATI, OH 45202**
> **(SERVE VIA CERTIFIED MAIL)**

**AND**

**CHRIST HOSPITAL**
**2139 AUBURN AVENUE**
**CINCINNATI, OH 45219**

> **SERVE:**

**CT Corporation System**
**4400 Easton Commons Way**
**Suite 125**
**Columbus, OH 43219**
**(Serve via Certified mail)**

**AND**

**THE CHRIST HOSPITAL**
**PHYSICIANS, LLC**
**312 WALNUT STREET #1160**
**CINCINNATI, OH 45202**

**SERVE:**
**George Vincent**
**255 East Fifth Street**
**Cincinnati, OH 45202**
**(Serve via Certified mail)**

**AND**

**TRIHEALTH, INC.**
**d/b/a TRIHEALTH PHYSICIAN**
**PARTNERS and GROUP HEALTH**
**PHYSICIAN PARTNERS**
**Trihealth G, LLC**
**625 Eden Park Dr.**
**Cincinnati, OH 45202**
**&**
**619 Oak St.**
**Cincinnati, OH 45206**

**AND**

**BETHESDA HOSPITAL, INC.**
**c/o OSAC, Inc.  Statutory Agent**
**100 S. Third Street**
**Columbus, OH 43215**

**AND**

**BETHESDA NORTH**
**619 Oak Street**
**Cincinnati, OH 45206**

**AND**

**GOOD SAMARITAN HOSPITAL**
**375 Dixmyth Avenue**
**Cincinnati, OH 45220**
**c/o OSAC, Inc. Statutory Agent**
**100 S. Third Street**
**Columbus, OH 43215**

**AND**

**UC HEALTH, LLC**
**3200 BURNET AVE.**
**CINCINNATI, OH 45299-3099,**

> **SERVE:**
> **GH&R Business Services**
> **312 Walnut St., Suite 1800**
> **Cincinnati, OH 45202**
> **(Serve via Certified mail)**

**AND**

**UNIVERSITY OF CINCINNATI**
**MEDICAL CENTER, LLC**
**234 GOODMAN STREET**
**CINCINNATI, OH 45219**

> **SERVE:**
> **GH&R Business Services, Inc.**
> **312 Walnut St., Suite 1800**
> **Cincinnati, OH 45202**

**AND**

**UNIVERSITY OF CINCINNATI**
**PHYSICIANS COMPANY, LLC d/b/a**
**UC HEALTH PHYSICIANS**
**3200 BURNET AVE.**
**CINCINNATI, OH 45299**

> **SERVE:**
> **CEO, General Manager, or General**
> **Counsel**
> **University of Cincinnati Physicians**
> **Company, LLC**
> **3200 Burnet Avenue**

**Cincinnati, OH 45229**

**AND**

**MERCY HEALTH CINCINNATI, LLC**
**(aka Mercy Health-Cincinnati)**
**4760 E. Galbraith Road, Ste. 108**
**Cincinnati, Ohio 45236**

> **SERVE: CLAIRE G. COMBS**
> **1701 MERCY HEALTH PLACE**
> **CINCINNATI, OHIO 45237**

**AND**

**BON SECOURS MERCY HEALTH INC.**
**1505 Marriottsville Road**
**Marriottsville, MD 21104**

> **SERVE: MICHAEL P. MCQUEARY**
> **1701 MERCY HEALTH PLACE**
> **CINCINNATI, OHIO 45237**

**AND**

**MERCY HEALTH -ANDERSON**
**HOSPITAL LLC**
**7500 State Road**
**Cincinnati, OH 45255**

> **SERVE: CLAIRE G. COMBS**
> **1701 MERCY HEALTH PLACE**
> **CINCINNATI, OH 45237**

**AND**

**MERCY HEALTH WEST HOSPITALS,**
**LLC, d/b/a MERCY HOSPITAL WEST**
**3300 Mercy Health Blvd.**
**Cincinnati, OH 45211**

> **SERVE: CLAIRE G. COMBS**
> **1701 MERCY HEALTH PL**
> **CINCINNATI, OH 45237**

**AND**

**MERCY HEALTH PHYSICIANS**
**CINCINNATI LLC**
**672 NEEB RD.**
**CINCINNATI, OH 45233**

      **SERVE: CLAIRE G. COMBS**
      **4600 MCAULEY PLACE**
      **CINCINNATI, OH 45242**

**AND**

**THE JEWISH HOSPITAL, LLC**
**4777 E. GALBRAITH RD.**
**CINCINNATI, OH 45236**

      **SERVE: CLAIRE G. COMBS**
      **1701 MERCY HEALTH PLACE**
      **CINCINNATI, OH 45237**

## JURISDICTION & VENUE

1. All above named Plaintiffs are domiciled in either Ohio, Kentucky or Indiana.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this claim "arises under" federal law; more specifically, The Sherman Anti-Trust Act as well as other federal claims.

3. This Court has personal jurisdiction over Defendants because at all relevant times Defendants have engaged in substantial business activities in the State of Ohio. St. Elizabeth participated in the scheme in Ohio.

4. This Court has personal jurisdiction over Defendants pursuant to R.C. § 2307.382 (Ohio Long-Arm Statute) because, at all relevant times, Defendants have systematically and continuously transacted, solicited, and conducted business in Ohio on their own, through the control of their subsidiaries, through the supply of products in Ohio, and through their employees, agents, or sales representatives, and Defendants have derived substantial

revenue from such business in Ohio.

5. Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because

a substantial portion of the wrongful acts upon which this lawsuit is based occurred in

this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because Defendants

are all corporations that have substantial, systematic, and continuous contacts in the State

of Ohio and they are all subject to personal jurisdiction in this District.

## CLASS ALLEGATIONS

6. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to

the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on

behalf of the following class (the "Class").

The members of the Class are every person who is being threatened, coerced, and illegally required by the Defendants to receive the first shot of Pfizer Covid-19 vaccine by September 1, 2021 and the second shot by October 1, 2021, or face immediate termination and/or other adverse consequences to their employment, careers, and reputations. The Class also includes every person being threatened with termination, fines, and other adverse consequences for refusing to receive a Covid vaccine as a condition of employment.

7. Excluded from the Class are employees of Defendants and their subsidiaries and affiliates;

governmental entities (but not government employees); and the judge to whom this case is

assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class

definition based upon information learned through discovery.

8. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs

can prove the elements of their claims on a class-wide basis using the same evidence as

would be used to prove those elements in individual actions alleging the same claim. This

action has been brought and may be properly maintained on behalf of the Class proposed

herein under Federal Rule of Civil Procedure 23.

9. <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The Class Members are so numerous that individual joinder of all Class members is impracticable. The precise number of Class Members in the Classes is unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

10. <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

    a. Whether Defendants engaged in the conduct alleged herein in this Complaint;

    b. Whether Defendants benefitted financially from Durrani's wrongful conduct;

    c. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, restitution, or injunctive relief; and

    d. Whether Plaintiffs and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

11. <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all Class Members were and are comparably injured and threatened by Defendants' wrongful conduct as described above.

12. <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Each Plaintiff is an adequate representative for the Class because their interests do not conflict with the interests of the other Class Members they seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this

action vigorously. The Class's interests will be fairly and adequately protected by
Plaintiffs and their counsel.

13. <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): Defendants,
and each of them, have acted or refused to act on grounds generally applicable to
Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief
and declaratory relief, as described below, with respect to the Class as a whole.

14. Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any
other available means for the fair and efficient adjudication of this controversy, and no
unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other Class
Members are relatively small compared to the burden and expense that would be required
to individually litigate their claims against Defendants, so it would be impracticable for
Members of the proposed Classes to individually seek redress for Defendants' wrongful
conduct. Even if Class Members could afford individual litigation, the court system could
not. Individualized litigation creates a potential for inconsistent or contradictory
judgments, and increases the delay and expense to all parties and the court system. By
contrast, the class action device presents far fewer management difficulties, and provides
the benefits of single adjudication, economy of scale, and comprehensive supervision by
a single court.

The Class period is from the time period of the first threat alleged in this Complaint to the
present and continuing on into the future. The Class members are seeking immediate injunctive
relief.

**ANTITRUST ALLEGATIONS RELATIVE TO ALL DEFENDANTS**

1. On August 5, 2021, all six major healthcare systems in the Cincinnati area announced their joint vaccine mandate for all their healthcare workers:

    A. St. Elizabeth Medical Center

    B. Children's Hospital

    C. Christ Hospital

    D. U.C. Health

    E. Tri-Health

    F. Mercy

2. **What these six systems have done is to conspire against all their healthcare workers so that they could not work in their field because these six systems are the healthcare fields in the tristate.**

3. Christ Hospital CEO Debbie Hayes, Cincinnati Children's CEO Michael Fisher, Trihealth CEO Dr. Richard Lofgren attended the August 5 press conference to announce the mandate.

4. All six major health systems in Greater Cincinnati will now require the Covid-19 vaccine for workers this fall- a major push that comes amid their false claim of growing spread of the Delta variant and a flattening in vaccination rates regionwide.  It's not true.

5. Collectively, these six health systems account for nearly 63,000 employees.  Nearly 40% are not vaccinated.

6. Individual lawsuits have been filed against these systems for vaccine claims.  The facts from those lawsuits follow this section.

7. "This is going to go a long way to putting the pandemic in the rearview mirror, if we can get everyone vaccinated," Cincinnati Children's CEO Michael Fisher said at the press conference.  "We invite other employers to join in this effort."

8. All six healthcare systems are using October 1 as the target date and September 1 as the first "shot" date.

9. Hospital officials declined to share projected vaccination rates for their staff and physicians, saying the numbers are estimates.  The process for reporting the Covid-19 vaccine status will be similar to the flu.

10. "It's a condition for employment." Trihealth CEO Mark Clement said.  "We take an oath to do no harm.  And this is one tangible way we can promote no harm for our patients." This is a lie.  Thousands of healthcare workers not treating patients not only never take that oath, they do not treat patients.  It's also offensive.  The vaccine causes harm to workers who receive it.  A vaccine is for the person taking it, not others.

11. The American Hospital Association, the American Medical Association, and the Ohio Hospital Association recently advised healthcare employers require workers be vaccinated against Covid-19.   This is completely self-serving to lock step with the government.

12. "Because of the highly contagious Delta variant and significant numbers of unvaccinated people- including children younger than 12 years old- Covid-19 cases, hospitalizations and deaths are again rising," Fisher said.  That too is a lie.  And to blame unvaccinated children is evil.

13. Garren Colvin in a St. Elizabeth leadership meeting stated:  "I'm not worried about anyone walking, they have no place to go."

31

14. All of the notices to all six Defendants were coordinated in both timing and content.

15. The plan was simple. If the six large systems stuck together, all the employees would be trapped.

16. Per the Health Collaborative, 59% of those eligible in the 15-county region have been vaccinated against Covid-19. This of course means 41% have not.

**FACTS RELATIVE TO ST. ELIZABETH AND ALSO IN SUPPORT OF ALL DEFENDANTS**

17. **St. Elizabeth in this lawsuit is only a Defendant on the Anti-Trust case. There is a separate lawsuit against St. Elizabeth in federal court in Kentucky. These allegations also appear there. However, these allegations pertain to the other Defendants too.**

18. Defendants are requiring a mandate many of of their providers believe is dangerous and ineffective (**Exhibit 1**).

19. Plaintiffs on behalf of this class wish to not only stop the mandate, but stop the discriminatory the testing being required for asymptomatic healthcare workers and those who do have an exemption. Any discrimination is not warranted.

20. The world can disagree by 50% or more. This Court can disagree if it chooses. But, these Plaintiffs assert, with testimonial firsthand knowledge, the covid and vaccine issue in this country has been one of fraud upon the public from government, pharmaceutical, social media, mainstream media, corporate America, healthcare and political parties. These Plaintiffs are not alone. So do 50% of the St. Elizabeth medical providers pursuant to those on **Exhibit 1**. The most recent fraud is Americans are not receiving an FDA approved vaccine (**Exhibit 3**).

21. The Medical Exemption form, **Exhibit 4**, is a blanket conclusionary form which their own doctors contradict.  **Exhibits 1 and 2**.

22. The main purpose in the dismissal and refiling was the obtainment of affidavits.  These are a work in progress and those affidavits will be filed in support of injunctive relief before the hearing.

23. However, in light of the attached letter, **Exhibit 1**, and the attached report/letter **Exhibit 2** coming from nearly 50 St. Elizabeth doctors and practitioners, we are refiling now.  This Court must help save these workers and by extrapolation, this country.

24. Dr. Amy J. DiChiara wrote a 27-page letter to Garren Colvin, CEO of St. Elizabeth Hospital, Dr. Robert Pritchard, CEO of St. Elizabeth Physicians and the Board of St. Elizabeth Healthcare (**Exhibit 2**).   It is a detailed explanation of all the issues and speaks for itself.  A review of all the bold subtitles says it all.  This applies to all Defendants.

25. Why would any St. Elizabeth or tristate healthcare workers take the vaccine which a group of esteemed doctors at the facility would not recommend taking?

26. **Exhibit 2** was provided to Colvin and Pritchard, who promised it would be sent to the Board.  They did not send it to the Board.  They only sent it to only the St. Elizabeth Physicians Executive Team, not the community Board members.

27. The St. Elizabeth Healthcare/Physician letter sent to their workers on August 6 states: "vaccines will provide strong protection against unintentionally carrying the virus to work and spreading it to patients and peers."  All of the Defendants letters said the same thing.

28. Colvin and Pritchard know this is not true.  Colvin conceded that point and promised he would write a "new letter" to the workers.

29. Despite this, no new letter to healthcare works has been sent.

30. No other Defendant has written a correction.

31. Colvin claimed the real reason for the vaccine mandate is its "therapeutic" basis.  He admitted the letter sent to the healthcare workers was misleading.

32.  Defendants are intentionally misleading the healthcare workers.  They are misleading them with the claim the vaccine will stop the spread of infection.

33. Defendants KNOW they have lied to the entire work force (**Exhibit 3**).

34. At Defendant hospitals, vaccinated patients are in ICU.  The unvaccinated are obese or morbidly obese or have diabetes.  Often times there are more patients in the ICU for drug overdose or alcoholism or suicide attempts rather than Covid patients.  These have skyrocketed in the last year from lockdowns.

35. Defendant primary care doctors are sending Covid patients to their hospitals, no matter the security.

36. The FDA approval letter to Defendant workers is also a lie, pursuant to St. Elizabeth doctors.  The Comirnaty vaccine is the one approved and is not even in production (**Exhibit 3**).

37. The attached emails prove the fraud (**Exhibit 3**).

38. The above facts apply to all Defendants because all have told the same lies.

**THIS IS FRAUD ON THE ENTIRE AMERICAN PUBLIC.**

**STRONGEST CLAIM NOT VIOLATION OF ANTITRUST**

**VIOLATION OF ADA**

39. Plaintiffs assert as their strongest claim this fact scenario which they can prove by sworn testimony and affidavits.  It is Cause of Action I and II.

40. Without conceding Pfizer's vaccine is approved or that Defendants can under law mandate a vaccine (Plaintiffs refute both), let's assume both the above.

41. If both are true, would it not require Defendants NOT to corrupt the process?

42. The American Disability Act allows anyone to seek a medical or religious exemption. It is the law.

43. The evidence will be, despite their denial, Defendants directly, indirectly, "wink and a nod" or however you want to describe it, had their physicians deny medical exemptions carte blanche with few exceptions.

44. The process for deciding medical and religious exemptions is corrupted too by an unknown committee, unknown members, violation of confidentiality and delay in deciding them.

45. This has resulted in for EVERY member of the class either having not received the exemption; caused them to not even apply for the exemption or to give up and resign or to get vaccinated. Other consequences are no doubt applicable. For those who have received an exemption, discriminatory testing has been required.

**FACTUAL ALLEGATIONS RELATIVE TO CCHMC**

46. Children's Hospital Medical Center (CCHMC) will place employees on two-week suspension on October 1, 2021, if not fully vaccinated for COVID-19.

47. The two-week suspension will give employees "time to think and comply."

48. CCHMC will terminate employment on October 31, 2021, if employee is not fully vaccinated.

49. CCHMC CEO, Michael Fisher, lacks integrity.

50. CCHMC providing unethical and immoral actions.

51. CCHMC is violating medical autonomy.

52. CCHMC is falsifying Informed Consent.

53. CCHMC leadership causing peer pressure on associates.

54. CCHMC guilting associates.

55. CCHMC is knowingly holding career and salary as leverage to vaccinate.

56. CCHMC is coercing all associates.

57. CCHMC is knowingly creating animosity between the vaccinated and unvaccinated associates.

58. CCHMC is knowingly creating mental health distress in associates regarding COVID–19.

59. CCHMC COVID–19 mandate is creating associates home issues with spouse/significant other.

60. CCHMC advised associates not post on social media accounts regarding vaccines/protests.

61. CCHMC is forcing their associates to do an action that associate does not believe in.

62. CCHMC knowingly is putting patients' lives at risk by the vaccine mandate.

63. CCHMC is ridiculing associates by blaming them for "spreading Covid."

64. CCHMC has created a hostile work environment.

65. CCHMC giving employees very short and unfair timeline.

66. CCHMC is refusing employees alternative options to COVID-19 vaccine.

67. Religious and Medical exemptions being denied.

68. CCHMC requiring employees to report for shift even after exposure to COVID-19 person.

69. CCHMC is requiring employees to use their PTO if side effects from COVID-19 vaccine.

70. CCHMC refusing to allow employees to use accrued PTO time during COVID-19 "suspension."

71. CCHMC utilizes a self-screening COVID process for employees.

72. CCHMC requiring religious or medical exemption to "prove nursing judgement or abilities."

73. CCHMC HR department will decide who gets exemption approval.

74. CCHMC requires supporting documentation for religious exemption.

75. Dedication is no longer valued at CCHMC.

76. CCHMC not reporting all adverse side effects.

77. CCHMC pressuring employees to receive COVID-19 vaccine.

78. CCHMC criticizing unvaccinated employees stating they are "harmful."

79. CCHMC, Cleft & Craniofacial Clinic physicians, tell other employees "the unvaccinated should be fired immediately."

80. CCHMC, Cleft & Craniofacial physicians, tell other employees the unvaccinated "they should be ashamed of themselves."

81. CCHMC offers cash incentives to get the COVID-19 vaccine.

82. CCHMC is shaming employees for not receiving COVID-19 vaccine to date.

83. CCHMC rehiring employees but requires vaccination decision before proceeding with orientation.

84. CCHMC is not providing internal website with an exemption option nor questions/concerns tab.

85. CCHMC is making mandate an ultimatum.

86. COVID-19 vaccine administration form requires signature stating, "I volunteered to take this vaccine."

87. CCHMC has no regard to personal belief, natural immunity or informed consent.

88. CCHMC administration/management are bullying and harassing unvaccinated employees.

89. CCHMC is blatantly lying and passing false information to employees.

90. CCHMC employees are seeing employer retaliation.

91. CCHMC refuse to allow titer draws prior to COVID-19 vaccine.

92. CCHMC has threatened employees that if caught protesting for Medical Freedom, they will be terminated.

93. CCHMC is manipulating employees.

94. CCHMC is currently short staffed prior to COVID-19 vaccine mandate.

95. Physicians refusing to sign medical exemptions stating, "our hands are tied."

96. CCHMC advising employees they are not receiving exemptions at this time.

97. CCHMC instructing physicians and nurse to push COVID-19 vaccine.

98. CCHMC refused to give employees annual raise in 2020 due to COVID-19 pandemic and expenses from it.

99. Personal and philosophical reasons for not receiving COVID – 19 vaccines will not be granted.

100.    Deadline for associate's completion of COVID – 19 vaccine is October 1, 2021.

101.    CCHMC mission is "to purse optimal health for every child within our reach."

102.    CCHMC CEO, Michael Fisher, has an income of 1.7 million annually.

103.     CCHMC is knowingly mandating the booster vaccine once the requirements are

presented.

104.     CCHMC knowingly has an interview process to question employees with

exemptions.

105.     CCHMC knowingly is mandating personal religious information from associates.

106.     CCHMC knowingly was awarded government funding from if facilities

"mandated" vaccine.

107.     CCHMC knowingly forces physicians to violate the Hippocratic Oath or be

reprimanded.

108.     CCHMC knowingly forces nurses to violate the Nightingale Oath or be

reprimanded.

109.     CCHMC is knowingly disregarding the Nuremberg Code.

110.     CCHMC knowingly is denying medical letters from physicians regarding

employees with medical conditions re: COVID-19 exposure.

111.     CCHMC knowingly has to mandate the Influenza (Flu) vaccine, with 80%

vaccination rate, in order to keep Medicare/Medicaid funding under the Affordable Care

Act (ACA).

112.     CCHMC unable to provide specific information on COVID – 19 vaccines.

113.     CCHMC knows there is NO specific test to rule the Delta variant.

114.     CCHMC knows that the PSR testing can not specify a specific virus.

115.     CCHMC is knowingly aware that antibodies remain in person's blood for 90

days.

116.     CCHMC is knowingly aware that patients/associates tested within 90 days of positive test will result in false/positive readings.

117.     CCHMC is knowingly aware that they cannot count positive tests conducted within 90 days of positivity.

118.     CCHMC is stating the COVID-19 vaccine prevents one from COVID-19 virus.

119.     CCHMC states the COVID-19 vaccine prevents transmission of the COVID-19 virus.

120.     CCHMC knowingly acknowledges COVID-19 can be contracted in fully vaccinated.

121.     CCHMC knowingly is falsifying the correct number of COVID-19 cases.

122.     CCHMC knowingly is falsifying reports to VAERS on adverse side effects.

123.     CCHMC knowingly is not reporting all adverse side effects to VAERS.

124.     CCHMC knowingly is having associates report to work during exposure to positive COVID-19 family members in same home.

125.     CCHMC knowingly is violating First Amendment Rights.

126.     CCHMC knowingly is violating human, civil and legal rights.

127.     CCHMC is knowingly violating HIPAA Policy.

128.     CCHMC is knowingly committing Adult and Child Abuse.

129.     CCHMC is forcing tyranny.

130.     CCHMC Knowingly allowing management to call employees; stupid, dumb, incompetent, and uneducated.

131.     CCHMC knowingly knows of an Ethics complaint filed on August 12, 2021 for workplace harassment.

132.     CCHMC, Dr. Saal, is knowingly bullying employees stating, "you should be fired for not vaccinating."

133.     CCHMC knowingly has management texting employees recommending they find outside jobs outside of hospital.

134.     CCHMC knowingly "suspended" an employee for posting on personal social media, opinions on hospital mandate. Advised her to not return until she sought medical attention from a physician stating she was "mentally fit to return".

135.     CCHMC knowingly denied a Christian employee a religious exemption and stated "It would have been approved if you were Indian."

136.     CCHMC knowingly changed termination wording to separation.

137.     CCHMC is knowingly denying exemptions due to "the medical board and I recommend the vaccine".

138.     CCHMC CEO, Michael Fisher, is bypassing Directors in the exemption process.

139.     CCHMC knowingly knows that PET scans regarding cancer patients will have a false/positive result. Due to the vaccine.

140.     CCHMC is knowingly offering traveling nurses, who are vaccinated, to take NICU positions for $2800/week.

141.     CCHMC knowingly will not allow employees to work nor offer an additional incentive. Claims "better financially."

142.     CCHMC knowingly is aware that the VAERS website is reporting 6,000 deaths from the vaccine. Which is a lie, all cases are not being reported.

143.     CCHMC knowingly is aware that the VAERS website is reporting 35,000 from adverse side effects. Which is a lie, all cases are not being reported.

144.     CCHMC knowingly laid off employees from April 2020 – September 2020 due to lack of admissions.

145.     CCHMC CEO, Michael Fisher, knowingly told employees they are not to take to any media outlets.

146.     CCHMC CEO, Michael Fisher, knowing admitted that persons can still be infected with COVID-19 after vaccination.

147.     CCHMC CEO, Michael Fisher, claims that natural infection is not more protective than the COVID-19 vaccine.

148.     CCHMC CEO, Michael Fisher, knowingly claims the COVID-19 vaccines are proven to be highly protective, even against other variants.

149.     CCHMC CEO, Michael Fisher, knowingly states that" it is impossible to contract COVID-19 from the vaccine."

150.     CCHMC CEO, Michael Fisher, knowingly states "testing forms we use can detect the variants".

151.     CCHMC CEO, Michael Fisher, knowingly stated "the trails so far have not tested the vaccine in immunocompromised people."

152.     CCHMC CEO, Michael Fisher, knowingly terminated two employees just for talking to media. On their personal time.

153.     On August 5, 2021, Cincinnati Children's Hospital Medical Center (CCHMC) sent out an email to all employees, vendors, contractors and volunteers that they must be fully vaccinated by October 1, 2021.

154.     Exemption forms were not sent out until August 13, 2021.

155.     Psychological Exemptions are not being offered as have been in the past.

156.     Mandate states that if the vaccine causes side effects, employees must use their PTO time to be off.

157.     By submitting a medical exemption, you are required to give CCHMC full access to your medical records.

158.     Managers at CCHMC are encouraging their staff who refuse to get the vaccine to find a job outside the hospital.

159.     In the hospital chat "YAMMER", CCHMC doctors were telling everyone that no one has died from the covid vaccine.

160.     Employee states that HIPAA and other privacy acts are not being followed by staff as they are asking people if they are vaccinated and their reasoning for not doing so.

161.     Employee was told that her religious exemption was denied and that if she was "Indian", they would have approved it.

162.     Employee states that they were performing their own temperature checks at the beginning of their shift.  They were to record it in a notebook and someone would come at the end of the shift and sign off on it.

163.     Employee has asked for the ingredients of the vaccine several times and each time has been told they don't have them.

164.     Employee states that they are still looking for COVID vaccination participants in a study, yet they are mandating something they are still researching.

165.     Employee states that numerous children who have received the vaccination have come back to their emergency rooms with cardiac arrest, myocarditis, endocarditis and many other issues.

166.     Employees who have tested positive for antibodies are still being mandated to take the vaccine.

167.     Employee states she asked her manager about getting a medical exemption due to nursing her child and was told to "switch her baby to formula."

## FACTUAL ALLEGATIONS RELATIVE TO CHRIST HOSPITAL

168.     Christ Hospital sent out email to all employees, vendors, contractors and volunteers on August 5, 2021 that the vaccine will be mandated with a deadline of October 1, 2021.

169.     Email dated August 5, 2021 stated that anyone getting the Moderna vaccine must get their first vaccine by September 2, 2021 and their second dose by October 1, 2021. Anyone not complying with the mandate will be subject to being suspended and/or terminated.

170.     Exemption forms were sent out to staff on August 13, 2021 and must be returned no later than September 24, 2021.

171.     Vaccine waiver that is to be signed by the employees, vendors, contractors and volunteer states that "I understand the benefits and risks of being vaccinated and I voluntarily assume full responsibility for any reactions that may result."

172.     If granted exemption, employees, vendors, contractors and volunteers agree to be tested weekly for COVID-19.

173.     Deborah Hayes, President and CEO, told an employee "All healthcare facilities, not only from our area, but all of us will be implementing this policy, so think hard before making your decision to leave, you may not have a career."

174.    Member of Infectious Control Committee told a staff member that only 50% of COVID tests are accurate.

175.    Billing department employee states that Christ Hospital receives around $10,000 for a positive COVID patient, another $15,000 for a COVID hospitalization and $30,000 for a COVID death.

176.    Employee states that if someone in their immediate family tests positive for COVID they are still required to report if they are asymptomatic.

177.    Employee states that one employee called and stated her entire family had tested positive for COVID.  Christ Hospital told the employee to report to work since she was asymptomatic.  Employee reported to work and ate lunch with everyone in the lunchroom and took their breaks with other staff members as well.  The employee was tested at the end of her shift and received a positive result.

178.    Employee states that no COVID tests are being given to the vaccinated patients before their procedures and some have been tested after the procedure and found to have COVID.

179.    Employee states that at first, temperature checks were being performed when they entered the hospital, but it has not happened in months.

180.    Employee states that during the no visitor policy, nurses, at their discrepancy, were allowing certain families to come in and visit their loved ones.

181.    Employee states that there has always been a pregnancy deferment option for any vaccine.  However, Christ Hospital is not allowing this deferment for the vaccine mandate.

182.    On July 11, 2021, an employee sent an email to Deborah Hayes, Thomas Lamarre, Victor DiPilla, Rosie Thomas, and Amanda Thompson, asking questions related to the Covid-19 vaccine.

183.    On July 11, 2021, the President and CEO of The Christ Hospital Health Network (TCHHN), Deborah (Debbie) Hayes, replied to the email. In this reply, Debbie assured the employee "that there are NO financial considerations or incentives that are influencing any decisions that we make related to COVID or the vaccine." In addition, Debbie stated that she hoped "that all of our team members will choose to stay with us once we move into the next phase of requiring the vaccine. A growing number of healthcare organizations across the county have already made their announcements to do so."

184.    On August 5, 2021, an email from the President and CEO, Debbie Hayes, and the Chief Clinical Officer/President TCHP, Costa Andreou, was distributed notifying of a new policy taking immediate effect and requiring the Covid-19 vaccine by October 1, 2021.

185.    Those who have not received the Covid-19 vaccine by October 1, 2021, in accordance with the policy, will be deemed "unfit to work."

186.    Those who have received exemptions for the Covid-19 vaccine will be required to undergo testing for Covid-19 on a weekly basis.

187.    On August 9, 2021, an email from the TCHHN President and CEO, Debbie Hayes, and the TCHP Chief Clinical Officer/President, Costa Andreou, was distributed which included a comparison of the Delta variant to the chickenpox and claimed that

everyone is vaccinated against the chickenpox. This same email also bargained productive dialogue for information needed for informed decisions.

188.     On August 9, 2021, an employee sent an email to the head of infectious disease at TCHHN, Dr. Thomas Lamarre, asking two questions:

    a.     "What test do we have to determine alpha vs delta variants?"

    b.     "How do we know, beyond a shadow of a doubt, that the delta variant is running rampant?"

189.     On August 10, 2021, Dr. Thomas Lamarre provided an emailed response to the employee which included the following statements:

    c.     "The CDC reports viral sequencing data from 17 states that track variants."

    d.     "The Ohio Department of Health also performs viral sequencing, but not real time and their data typically lags 4 to 6 weeks behind everyone else's."

    e.     "University of Cincinnati and Cincinnati Children's both perform real time viral sequencing for the community (not published-personal communication; data also presented to ODH and Cincinnati and Hamilton County Health Depts.) with viral sequencing this past week demonstrating over 90% of viral sequences delta variant."

190.     On August 10, 2021, an employee received an email from Diane Bolser, Manager, Registration Services, identifying the employee "as an employee who has not received the Covid vaccine." The email continued asking for proof of vaccination if already vaccinated, and if not already vaccinated asking about any questions regarding the exemption process and providing FAQs.

191.    During a virtual meeting, Debbie Hayes stated "All healthcare facilities in not only this area but all over the US will be implementing this policy, so think really hard before making your decision to leave; you may not have a career!"

192.    The Christ Hospital (TCH) has a policy stating that 100% remote employees are exempt from the 2021 COVID-19 vaccination mandate.

193.    On March 16, 2021, Dr. Jamie Waselenko, a TCH physician, wrote a letter to TCHP Clinical Officer/President, Dr. Costa Andreou, expressing safety concerns surrounding the Covid-19 vaccination. Following the letter, Dr. Waselenko's contract with TCHP was not renewed.

## FACTUAL ALLEGATIONS RELATIVE TO TRIHEALTH

194.    On August 5, 2021, TriHealth sent out email to all employees, vendors, contractors and volunteers mandating the vaccine by October 1, 2021.

195.    Mark Clement, President and CEO of TriHealth, sent email out to staff and asking them to "do no harm to your patients and get vaccinated."

196.    Mark Clement, President and CEO of TriHealth said in an employee forum "In no way are we forcing you to get the vaccine.  This is a choice, your choice to make and if whether or not you want to stay employed with TriHealth."

197.    TriHealth employees are being bribed to get the vaccine with Reds Tickets and pay increases.

198.    Corporate employees have threatened staff that they are fully prepared to hire nurses from the Philippines and pay them $50-$70 an hour.

199.    TriHealth has sent out emails to previous employees asking them to return and offering them up to a $33,000 bonus.

200.    Employee stated that a co-worker in management told her that TriHealth is receiving a kickback for getting their employees vaccinated.

201.    Employee states that if an exemption is granted they are required to consent to weekly testing.

202.    Employee states her manager knowingly had COVID and still came to work and made rounds without wearing a mask.

203.    Employee states two co-workers that live in the same household and one tested positive for COVID and the other did not. The employee who did not test positive still had to report because she was asymptomatic.

204.    Employee states that patients have been spread out over the entire hospital rather than centralized together due to a staff shortage and having to place them where beds were available.

205.    Employee states that she has cared for COVID patients and open heart surgery patients during her shift. She reported it to the President and CEO, Mark Clement and was told "to continue to wear PPE and everything would be fine."

206.    Employee states that she was left alone during her shift with 9 patients by herself due to staffing.

207.    Employee states that the ratio on critical floors is 6-7 patients per nurse, which is not following procedure.

208.    Employee states last year on the 11th floor at Good Samaritan, a patient was found dead in their room and not been checked on for over 8 hours due to staffing issues.

209.    TriHealth managers are encouraging anyone who is breastfeeding a child to get the vaccine and "pass the antibodies on to their babies."

210.　　　Employees who are pregnant or who are experiencing fertility issues are being

mandated to get the vaccine because their exemptions are being denied.

### FACTUAL ALLEGATIONS RELATIVE TO UC HEALTH

211.　　　On August 5, 2021, University of Cincinnati Medical Center emailed all

employees, vendors, contractors and volunteers informing them of the vaccine mandate

for October 1, 2021.

212.　　　On August 10, 2021, an email came out stating "Our tests look for pieces of viral

genetic material specific to the virus that causes COVID-19.  However, we don't

sequence viral specimens, so we can't tell which strain (ex. Delta variant) it is.

213.　　　Rick Lofgren, CEO of UC Health is President of the Ohio Hospital Association.

He is pushing vaccine mandate on everyone.  On a live broadcast to the staff, he stated

the vaccine was safe and has no long-term effects.  However, when it was published, the

version they received live was altered and didn't have the same comments in it.

214.　　　UC students were told that they can request an alternative site placement should

they choose not to take the vaccine.  If an alternative site is not available, then it will

affect their on-time completion of academic requirements and/or graduation.

215.　　　On August 12, 2021, staff statistics were sent out to an employee.  It stated they

had to close down 13 beds in the 3 South (Neuro), 4 beds in 5 SW, 4 beds in Ridgeway

inpatient and 8 beds in 8 NW due to lack of staffing.

216.　　　On August 12, 2021, the supply report stated that the use of the supplies had

decreased in the following areas:

　　　a.　N95 masks

　　　b.　Simple masks

      c.   Isolation gowns

      d.   Bleach Wipes

217.     On August 12, 2021, the employee health reports stated that they had 40 positive COVID tests from the staff, 17 of those had been vaccinated in the last 7 days.

218.     On August 16, 2021, Jimmy Duncan, SVP and Chief Human Resources announced a $52 million investment into their employee incentive program which included pay increases and referral bonuses.

219.     Employees feel they are being discriminated against for not getting the vaccine. Managers are making cruel comments to the staff who are refusing.

220.     Employee in the Radiology department states she told her manager she was not going to receive the vaccine.  The manager responded in front of the entire department "Bunch of DAMN anti-vaxxers."

221.     Employee states he is recovering from a brain aneurysm and being denied an exemption.

222.     Employee states she knows of several patients who received the vaccine and it was never documented.

223.     Defendant UC Health has internally adopted a blanket policy of refusing to grant or even *consider* any medical or religious exemptions from receiving the mandated COVID-19 vaccine.

224.     Defendant UC Health routinely ignores any and all medical conditions of concern to Plaintiffs, and mandates that all Plaintiffs receive vaccination despite *any* medical condition which poses problematic to vaccination. Such mandate has, at times, stood in

spite of multiple physicians advising an employee against receiving the COVID-19 vaccine.

225.    Defendant UC Health refuses to medically exempt employees from COVID-19 vaccination who have had previous adverse reactions to other vaccines.

226.    Defendant UC Health refuses to accommodate any employee who sincerely holds religious beliefs precluding the employee from voluntarily receiving the COVID-19 vaccine.

227.    Defendant UC Health mandates COVID-19 vaccination for all employees who are pregnant, nursing, or trying to become pregnant, in spite of any concerns or objections such employees have to receiving vaccination on this basis.

228.    Defendant UC Health makes no exemption to the mandated COVID-19 vaccine for employees who have already contracted COVID-19 and fully recovered, regardless of tests indicating such employees retain COVID-19 antibodies.

229.    Defendant UC Health makes no exemption to the mandated COVID-19 vaccine for employees working entirely remotely, in spite of the fact that such employees never interact in person with coworkers or the public.

### FACTUAL ALLEGATIONS RELATIVE TO MERCY

230.    On August 5, 2021, an email was sent by David Fikse, President/Cincinnati Market to all roles within Mercy Health, whether clinical or shared services, working on site or remotely stating that a vaccine mandate was "coming" but failed to give a deadline.

231.    Mercy Health stated they were not mandating the vaccine "system wide" but rather only mandating it in select markets.

232.    Brian Smith, Chief Operating Officer stated that this decision was based on "our firm belief, grounded in scientific evidence, that the benefits of the vaccine far outweigh any potential risks."  Brian Smith has been pushing the vaccine to employees since the announcement was made.

233.    As of August 12, 2021, after repeated requests for exemption forms, Mercy Health they had to "create them" and would get them out as soon as they could.

234.    Employees state that within 24 hours of the mandate being announced, raises were announced to almost the entire staff.

235.    Employees states that in addition to the raises that they are receiving bribes of being entered into a raffle for $1,000 if they get the vaccine.

236.    Several employees report that they have been using improper PPE since the pandemic started.

237.    Employee states that Mercy Health sent an interdepartmental memo stating the N-95 masks are no longer needed in COVID-19 confirmed cases, unless an aerosolizing procedure is taking place.

238.    Employee states the form required when vaccinating a patient is called a VIS (Vaccine Information Statement) is not being used.  Instead, they are using an EUA form.

239.    Several employees report they were required to re-use their N-95 masks due to a shortage.

240.    Employee states that when the pandemic started, they didn't have enough masks in the hospital so they had to reach out the community for help to acquire some.

241.     Employee in the Maintenance department states that he watched all the fraudulent spending going on and when something was needed they were told to "charge it to the COVID funds."

242.     Employee states that she is seeing firsthand the effects of the vaccine which are but not limited to;

    a.   Tremors

    b.   Pulmonary Embolisms

    c.   Neurological Disorders

    d.   Blood Clots

    e.   Death

243.     Employee states that she received a call from a patient's family member because they had received the death certificate of their loved one. The family was upset because the cause of death was listed as COVID. The family member stated that she called the Cincinnati Coroner's Department and was told they had to put COVID down regardless if it was the direct cause or not.

244.     Several employees state that the majority of those hospitalized at this time are vaccinated patients.

245.     Several employees state that with a positive COVID diagnosis in their direct household; they were told to report anyway as long as they weren't running a fever.

246.     Employee states that many in her department are trying to get pregnant, are pregnant and/or breastfeeding their children and have autoimmune disorders and are being told they will still be required to the get vaccine.

247.     Several employees states they are suffering from panic attacks and emotional

breakdowns over being required to get the vaccine and the uncertainty of their future.

**GOVERNMENT INVOLVEMENT IN HEALTHCARE AND DEFENDANT**

248.     **Exhibit 5** is the chart reflecting how Defendant and all tristate hospitals received

in 2020 massive amount of money from government via the taxpayer.

According to Lori Ritchey Baldwin, Defendant CFO 70% of St. E patients are covered by

Medicare and Medicaid.

249.     The major portion of the federal government's health business is conducted

through contracts and grants to states, localities, and private providers and organizations.

The federal government acts through financing intergovernmental and interorganizational

contracts to encourage various public health initiatives, convening participants around an

issue, coordinating activities, and developing state and local provider contracts. In return

for federal funds, states, localities, and private organizations must follow the federal

standards and policies set in the contract. Thus in many programs, the federal government

takes an oversight, policy-setting, and technical assistance role, rather than a direct

provider role. Federal contracts can take the form of seed money for researching and

developing new programs, such as Community Mental Health Centers, or they can be

support for ongoing activities, such as the Early Periodic Screening, Detection, and

Treatment Program. Contracts can be made with agencies to operate specific public

health programs or to support general agency activities. Contracts can also be made with

health care providers, such as nursing homes or home health agencies, for directly

delivering personal health services. Contracts with local areas and providers may be

operated through the states or be made directly with the local areas and private sector.

250.     The federal government plays a large role in the public health system in the country. It surveys the population's health status and health needs, sets policies and standards, passes laws and regulations, supports biomedical and health services research, helps finance and sometimes delivers personal health services, provides technical assistance and resources to state and local health systems, provides protection against international health threats, and supports international efforts toward global health. The federal government does all of these mainly through two delegated powers: the power to regulate interstate commerce and the power to tax and spend for the general welfare.

251.     At present, the main federal unit with responsibility for public health is the United States Public Health Service in the Department of Health and Human Services. The second major unit is the Health Care Financing Administration, also in the Department of Health and Human Services.

252.     The Secretary of the Department of Health and Human Services is chosen by the President of the United States and sits in his Cabinet.

253.     The United States Public Health Service includes the (1) Centers for Disease Control; (2) the National Institutes of Health.

254.     The Centers for Disease Control, the main assessment and epidemiologic unit for the nation, directly serves the population as well as providing technical assistance to states and localities. The National Center for Health Statistics within the Centers for Disease Control is the main authority for collecting, analyzing, and disseminating health data.

255.     The major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations.

256.     It should be noted that the public health system, as divided above by national, state, and local settings, is not necessarily that static. There are many channels for information and coordinated activity between national, state, and local levels in both the public and private sectors, just as there is exchange of information and coordination of activity between the health agencies, other agencies, and private actors.

257.     Hospitals can not survive with the Medicare and Medicaid payments made to them.

258.     **Case 1:21-cv-22440-KMN filed by Trump v. Facebook describes how the U.S. government worked with Facebook to censure and de-platform Donald Trump from Facebook.  Trump maintains the social media action is in reality government action. While true, that's not even close to how government directs hospitals**.

259.     Defendants receive the majority of their funding from the state and federal government in the form of Medicare and Medicaid payments.[1]

260.     In addition, as of May 2021, Congress had allocated $175 billion in relief for healthcare providers to help them recoup losses tied to the Covid-19 pandemic.[2]

261.     Moreover, the major portion of the federal government's health business is conducted through contracts and grants to states, localities, and private providers and organizations. The federal government acts through financing intergovernmental and interorganizational contracts to encourage various public health initiatives, convening participants around an issue, coordinating activities, and developing state and local provider contracts. In return for federal funds, states, localities, and private organizations

---

[1] The Nation's Health Dollar ($3.8 Trillion), Calendar Year 2019: Where It Came From (cms.gov) (last visited August 13, 2021)
[2] CARES Act Provider Relief Fund: Data | HHS.gov (last visited August 21, 2021)

must follow the federal standards and policies set in the contract. Thus, in many programs, the federal government takes an oversight, policy-setting, and technical assistance role, rather than a direct provider role. Federal contracts can take the form of seed money for researching and developing new programs, such as Community Mental Health Centers, or they can be support for ongoing activities, such as the Early Periodic Screening, Detection, and Treatment Program. Contracts can be made with agencies to operate specific public health programs or to support general agency activities. Contracts can also be made with health care providers, such as nursing homes or home health agencies, for directly delivering personal health services. Contracts with local areas and providers may be operated through the states or be made directly with the local areas and private sector.

## PRESIDENT BIDEN & VACCINE MANDATES

262.     July 29, 2021: Quotes from video

https://www.youtube.com/watch?v=UVIXqa9Rcg0

263.     "I'm calling on all states and local governments to use funding they have received, including from the American Rescue Plan, to give $100 to anyone who gets fully vaccinated" (Video time = 2:20 – 2:30)

264.     "It's time to impose requirements on key groups to make sure they're vaccinated" (Video time = 2:50 – 2:57)

265.     " Like what many other civilian hospitals are doing, The Department of Veterans Affairs will now require Covid-19 vaccines for Doctors and nurses and other healthcare workers who provide medical care for our veterans" (video time = 3:05 – 3:19)

266.    "Next, since many vaccinations are required for active duty military today, I'm asking the Defense department to look into how and when they will add Covid-19 to the list of vaccinations our armed forces MUST GET " (video time = 3:30 – 3:45)

267.    "Every federal government employee will be asked to attest to their vaccination status. Anyone who does not attest, or is not vaccinated, will require to mask, no matter where they work, test 1-2 times per week to see if they've acquired Covid, socially distance, and generally will not be allowed to travel for work. LIKEWISE, today, I am directing my administration to take steps to apply similar standards to all federal contractors. If you want to do business with the federal government, get your workers vaccinated" (video time = 4:06 – 4:53)

268.    Biden then urges all corporations to "follow suit."

269.    On August 18, 2021, Joe Biden announced nursing homes would not receive Medicaid or Medicare reimbursement unless all employees were fully vaccinated.

270.    There is no connection between financial renumeration and patient care and safety.

271.    President Biden even publicly declared anyone who would not take the vaccine is "not as smart as I thought you were."

272.    Medicare and Medicaid have notified hospital administrators that reimbursement will be based on the number of staff vaccinated.

**273.    Based upon the above, there is no question the vaccine mandate against Plaintiffs and hospitals is a mandate which is coming from government state action. In fact, it comes directly from the mouth of Joe Biden, the President of the United States.**

## THE COVID SCIENCE

274.      **Exhibit 6** is one of Plaintiff's expert affidavits and CV in support of Plaintiffs'

allegations.  Page 16 of that affidavit summarizes her conclusions.  She is a former Christ

Hospital hematologist and oncologist.

275.      The summary Dr. Waselenko gives is as follows:

● There is a great deal of concern regarding long-term safety with this new methodology
and caution should be exercised.

●Many people are being coerced into receiving an experimental gene therapy never
before used in humans. This is a clear violation of the Nuremberg code.

● Many patients do not recognize that this gene vaccine is an experiment and they are not
receiving appropriate informed consent including the discussion regarding no treatment
or alternative treatments.

● Most patients do not need and will not benefit from the COVID-19 gene base therapies
but will still incur long-term risk.

● All people have a right to decide for themselves whether they want to receive this
experimental gene-based vaccine or not after appropriate inform consent.

● Mandating this experimental therapy in any child or person is wrong.  Mandating the
COVID-19 gene-based vaccine in frontline workers and our military is short sighted and
potentially compromises our nation and our communities.  These are mission critical
personnel and the risking of their health in this setting is senseless and could lead to more
deaths (from patients who cannot be care for) or national security issues.

● These gene-based vaccines do not protect them from getting the COVID-19 infection,
transmitting the infection, or the development of resistant variants, and may put them at
risk of antibody dependent enhancement or another serious vaccine associated injury.

●To mandate that children receive this experimental gene therapy is highly inappropriate,
based on their negligible mortality with the coronavirus infection, low transmissibility
which has been documented in children, and their long-life expectancy in which they will
be at high risk of future toxicity, potential infertility, and the potential risk of perpetual
antibody dependent enhancement with coronavirus, influenza, or other respiratory
viruses. It is my opinion that mandating that children, adolescents, or young adults
receive this gene base therapy is criminal.

●Dr. Fauci, the NIAID, and others are complicit in fraud as categorically outlined by Dr.
Martin

276.     Plaintiffs also make as an Exhibit, **Exhibit 7**, an Addendum to Dr. Waselenko's report responding to St. Elizabeth's expert on the last filing and her prior affidavit **Exhibit 6.**

277.     The purpose of these affidavits is to support the allegations made so the Court knows there is medical basis for these allegations.

### PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

278.     Naturally acquired immunity developed after recovery from COVID-19 provides broad protection against severe disease from subsequent SARS-CoV-2 infection.[3].

279.     Studies have demonstrated prolonged immunity with respect to memory T- and Bcells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B-cells following a COVID-19 infection.[4]

280.     T-cells last "quite a while," but B-cells migrate to the bone marrow and last even longer.[5]

281.     Recent Israeli data found that those who had received the Pfizer Vaccine were 6.72 times more likely to suffer a subsequent infection than those with naturally acquired immunity.[6]

---

[3] Lasting immunity found after recovery from COVID-19 | National Institutes of Health (NIH) (last visited August 16, 2021)

[4] Dr. Harvey Risch, Yale School of Medicine, interview ("Risch interview"), Laura Ingraham Discusses How Medical Experts Are Increasing Vaccine Hesitancy (July 26, 2021), available at https://bit.ly/3zOL6Sx (last visited August 13, 2021).

[5] Risch interview.

[6] David Rosenberg, Natural Infection vs Vaccination: Which Gives More Protection? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 13, 2021).

282.     Israeli data also indicates that the protection Pfizer grants against infection is short lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April.[7]

283.     Those who received a second dose of the Pfizer Vaccine between January and April of this year were determined to have 39% protection against infection and 41% protection against symptomatic infection. This further suggests that the large number of breakthrough infections was the result of waning vaccine protection as opposed to the spread of the Delta variant.[8]

284.     Early data also suggests that naturally acquired immunity may provide greater protection against both the Delta and Gamma variants than vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to zero among those with natural immunity.[9]

285.     In this vein, a few weeks ago, the CDC reported that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads

---

[7] See Nathan Jeffay, Israeli, UK data offer mixed signals on vaccine's potency against delta strain, THE TIMES OF ISRAEL (July 22, 2021), available at bit.ly/3xg3uCg (last visited Aug. 13, 2021).

[8] See Carl Zimmer, Israeli Data Suggests Possible Waning Infection in Effectiveness of Pfizer Vaccine, THE NEW YORK TIMES (July 23, 2021); Kristen Monaco, Pfizer Vax Efficacy Dips at 6 Months, MEDPAGE TODAY (August 13, 2021), available at https://bit.ly/2VheBxw (last visited Aug. 13, 2021).

[9] Nicolas Vignier, et al., Breakthrough Infections of SARS-CoV-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021, 27(10) EMERG. INFECT. DIS. (Oct. 2021), available at bit.ly/2Vmjx43 (last visited Aug. 13, 2021).

to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[10]

286.　　Around three-quarters of cases in a Cape Cod outbreak occurred in vaccinated individuals, again demonstrating that the vaccines are inferior to natural immunity when it comes to preventing infection. [11]

287.　　Many experts believe that the solution to "breakthrough" cases (individuals who become infected after vaccination or reinfection) is treating patients with a therapeutic intervention—not mandating vaccines for everyone, which will not entirely solve the problem for the reasons discussed above. The availability and effectiveness of therapeutics thus bear on the validity of state actors' claims that a vaccine mandate is necessary to protect the public health.[12].

## COVID-19 VACCINES CAN CAUSE SIDE EFFECTS, INCLUDING SEVERE ADVERSE EFFECTS

288.　　Though the COVID-19 vaccines appear to be relatively safe at a population level, like all medical interventions, they carry a risk of side effects. Those include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea. More rarely, they can cause serious side effects that result in hospitalization or death. [13]

---

[10] *See* CDC reversal on indoor masking prompts experts to ask, "Where's the data?", WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited August 13, 2021).

[11] *See* Molly Walker, CDC Alarmed: 74% of Cases in Cape Cod Cluster Were Among the Vaxxed, MEDPAGE TODAY (July 30, 2021), available at bit.ly/2V6X3UP (last visited August 13, 2021).

[12] *See* Risch interview.

[13] Possible Side Effects After Getting a COVID-19 Vaccine | CDC ; Reactions and Adverse Events of the Pfizer-BioNTech COVID-19 Vaccine | CDC (last visited August 16, 2021).

289.     The vaccines could cause other side effects that remain unknown at this time given the preliminary, emergency stage of the vaccines' approval process. Put differently, as a matter of simple logic, one cannot be certain about the long-term effects of a vaccine that has existed only for approximately a year, and thus cannot have been studied over a substantial period of time.

290.     A recent study suggests that the SARS-CoV-2 spike protein can by itself trigger cell signaling that can lead to various biological processes.[14] The scientists who conducted the study concluded, "It is reasonable to assume that such events, in some cases, result in the pathogenesis of certain diseases."[15] Despite the experimental nature of the vaccine and the numerous adverse side effects related to the experimental vaccine including, but not limited to, death through anaphylactic shock[16], thrombosis with thrombocytopenia syndrome[17], blood clots, multi-system autoimmune disorders and multi-organ failure, and the fact that some scientists have concluded that it is reasonable to assume the experimental vaccine will result in the pathogenesis of certain diseases, [EMPLOYER] gave employees

---

[14] Suzuki YJ, Gychka SG. SARS-CoV-2 Spike Protein Elicits Cell Signaling in Human Host Cells: Implications for Possible Consequences of COVID-19 Vaccines. Vaccines (Basel). 2021;9(1):36. Published 2021 Jan 11. doi:10.3390/vaccines9010036

[15] Id.

[16] Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine- United States, December 14-23, 2020. MMWR Morb Mortal Wkly Rep 2021; 70:46-51. DOI: http://dx.doi.org/10.15585/mmwr.mm7002e1.

[17] Safety monitoring of the J&J/Janssen vaccine suggests a risk of an adverse event called thrombosis with thrombocytopenia syndrome (TTS), which involves blood clots with low platelets. Platelets are a type of blood cell that help blood clot. On April 13, the U.S. Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC) suggested pausing administration of the AD26.COV2.S Johnson & Johnson (JJ) vaccine to allow investigation of several cases of a severe thrombosis with thrombocytopenia occurring postvaccination. This announcement came on the heels of the initial reports of similar events in individuals receiving the CHaDOx1 nCov-19 AstraZeneca (AZ) vaccine outside the United States. Clinical and laboratory characteristics of TTS have recently been reported. This syndrome has been termed "vaccine-induced prothrombotic immune thrombocytopenia (VIPIT)" or "vaccineinduced immune thrombotic thrombocytopenia (VITT)" but is now termed "thrombosis with thrombocytopenia syndrome (TTS)" by the CDC and FDA. James B. Bussel, MD et al., American Society of Hematology, Thrombosis with Thrombocytopenia Syndrome (also termed Vaccineinduced Thrombotic Thrombocytopenia), April 29, 2021.

an ultimatum - if you want to keep your job, continue to feed your family, and avoid bankruptcy, you must be injected with the experimental COVID-19 vaccine.

## HERD IMMUNITY IN THE TRI-STATE AREA

291.    Herd immunity occurs when a large portion of a community (the herd) becomes immune to a disease, making the spread of disease from person to person unlikely. As a result, the whole community becomes protected — not just those who are immune.[18]

292.    Often, a percentage of the population must be capable of getting a disease in order for it to spread. This is called a threshold proportion. If the proportion of the population that is immune to the disease is greater than this threshold, the spread of the disease will decline. This is known as the herd immunity threshold.

293.    The percentage of a community that needs to be immune to achieve herd immunity varies from disease to disease. The more contagious a disease is, the greater the proportion of the population that needs to be immune to the disease to stop its spread. *Id.*

294.    There are two main paths to herd immunity for COVID-19 — infection and vaccines. Herd immunity can be reached when enough people in the population have recovered from a disease and have developed protective antibodies against future infection. *Id.*

295.    Herd immunity also can be reached when enough people have been vaccinated against a disease and have developed protective antibodies against future infection. *Id.*

296.    Herd immunity makes it possible to protect the population from a disease, including those who can't be vaccinated, such as newborns or those who have compromised immune systems.

---

[18] Herd immunity and COVID-19 (coronavirus): What you need to know - Mayo Clinic (last consulted August 12, 2021)

297.     According to a report from Harvard doctors, herd immunity is reached when at least

70% of the population either being vaccinated or exposed to the virus. Alvin Powell,

Vaccines can get us to herd immunity, despite the variants, HARVARD GAZETTE (Feb.

25,     2021),     https://news.harvard.edu/gazette/story/2021/02/vaccinesshould-end-the-

pandemic-despite-the-variants-say-

experts/#:~:text=A%20Harvard%20immunologist%20said

current,fight%20agaisnt%20the%20disease.

298.     All states are currently making progress toward herd immunity through a combined

approach. The number of fully vaccinated adults continues to rise. In addition, people in

each state have had confirmed infections with the COVID-19 virus.

299.     Research shows that those who have recovered from Covid-19 develop lasting

immunity, up to 6 to 8 months after infection.  Lasting immunity found after recovery from

COVID-19 | National Institutes of Health (NIH) (last visited August 13, 2021).

**THE SAFETY PROTOCOLS IN PLACE AT EVERY DEFENDANT HOSPITAL
AND THE NUMBER OF VACCINATED EMPLOYEES COMBINED WITH THOSE
WHO HAVE RECOVERED FROM COVID-19 ARE SUFFICIENT TO PREVENT
THE SPREAD OF THE COVID-19 VIRUS**

**300.**     On or around April 2020, the CDC recommended the wearing of non-medical

masks in public to lessen in public to lessen transmission of Covid -19 in the United States.

Scientific evidence for the protective effect of face masks and respiratory virus infection

in healthcare and community settings is overwhelming.[19]

**301.**     The wearing of masks, along with the other safety protocols recommended by the

CDC such as the social distancing and frequent hand washing contributed to the significant

reduction of the spread of Covid-19 disease before vaccines were made available.

---

[19] open (ncdhhs.gov) (last visited August 13, 2021).

**302.** After vaccines became widely available, on May 13, 2021, the CDC rescinded its guidance on mask requirements and social distancing. [20]

**303.** On June 28, 2021, the rapid spread of 43the Delta variant, a new variant of the Covid-19 virus, prompted the CDC to update once again its masks guidance and to urge even vaccinated people to wear masks again in indoor settings. [21]

**304.** Further, despite the current availability of vaccines, breakthrough infections are on the rise. [22] New evidence suggests that vaccinated people with breakthrough infections can carry as much as the virus as unvaccinated people. [23]

**305.** Current research shows that vaccinated people with a breakthrough infection will have milder symptoms and will rarely die. [24]

**306.** Defendant follows all of the CDC guidelines. It requires all of its employee and visitors, regardless of their vaccination status, to wear masks at all times. In addition, staff wears medically appropriate masks.

**EMPLOYER'S VACCINATION MANDATE POLICY AND CONSEQUENCES**

307. On July 29, 2021, Joe R. Biden, president of the United States announced that all federal employees and contractors are now required to be fully vaccinated against COVID-19 or face regular testing before returning to in-person work, and he also encouraged states and localities to pay $100 to each newly vaccinated American. [25]

---

[20] CDC ends indoor mask requirements for fully vaccinated people | AHA News (last visited August 13, 2021).

[21] Your Guide to Masks | CDC (last visited August 13, 2021).

[22] Breakthrough Infections and the Delta Variant: What to Know - The New York Times (nytimes.com)(last visited August 13, 2021)

[23] *Id.*

[24] *Id.*

[25] FACT SHEET: President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant | The White House (last visited August 13, 2021)

308.     Defendants in total disregard for the individual rights and possible well-being of its employees, Defendants announced the Policy on August 5, 2021.

309.     Plaintiffs are not given any other choice other than to accept the vaccination forced upon them by Defendants and complete it first by a shot by September 1 and then complete by October 1.

310.     As a result of the Policy, Plaintiffs are being pressured to take a vaccine that has not yet been finally approved and that they do not wish to take or lose their employment.

311.     If they choose not to take the vaccine and as a result lose their employment, the likelihood is great that they will not be able to find other employment because of Defendants' concerted action.

312.     By threatening adverse professional and personal consequences, each of the Policies not only directly and palpably harms Plaintiffs' autonomy and dignity, but it forces them to endure the stress and anxiety of choosing between their career and their health.

313.      The risk-avoidance benefits that each of the Policies purports to provide, compared to the restrictions and intrusive options offered to Plaintiffs are disproportionate. Similarly, given that the current health safeguards in place at Defendant and in particular the fact that all employees and visitors confer ample protection against transmission of the virus, each of the Policy is arbitrary and irrational.

314.     Finally, there is no indication that the Policy is tailored to account for its impact in an environment where employees comply with these guidelines and/or those who have acquired natural immunity.

315.     Thus, based on the level of vaccination attained in the population served by Defendants and within the employees of Defendants and the number of people who have

recovered from Covid-19 and are therefore protected in the population served by Defendants and within the employees of Defendants, there is no legitimate public health rationale for Defendants to mandate that all of their employees be vaccinated or face termination.

## REASONS PLAINTIFFS AND MEMBERS OF THE CLASS DON'T WANT TO TAKE THE VACCINE

316.    Based on existing estimates of people who have taken the vaccine AND those who had Covid - herd immunity has been achieved.

317.    The purpose of a vaccine is to make your body generate antibodies - those who had Covid have their own naturally generated and apparently robust antibodies.

318.    As opposed to the regular flu vaccine (which has decades of safety data and yet sometimes still "misses"), the Covid vaccine has no long-term data AND the rate at which the vaccine makes antibodies develop in those who take the vaccine is UNKNOWN.

319.    The current vaccine was developed for the original Covid-19 virus and not Delta (or other variants) THUS "breakthrough" cases RE: Lindsay Graham.

320.    FTC argument = According to Federal Trade Commission (FTC) Guidelines and the FTC's "Truth In Advertising,", promotional material—and especially material involving health-related products—cannot mislead consumers, omit important information, or express claims. All of this falls under the rubric of "deceptive advertising."

321.    Nuremberg code argument = EUA products are unapproved, unlicensed, and experimental. Under the Nuremberg Code—the foundation of ethical medicine—no one may be coerced to participate in a medical experiment. The individual's consent is absolutely essential. No court has ever upheld a mandate for an EUA vaccine. In Doe #1

v. Rumsfeld, 297 F. Supp. 2d 119 (2003)15, a federal court held that the U.S. military could

not mandate EUA vaccines for soldiers

322.    Institutional liability argument- whereas pharmaceutical companies that

manufacture EUA vaccines have been protected from liability related to injuries or deaths

caused by experimental agents since the PREP Act1 was enacted in 2005, companies and

all other institutions or individuals who mandate experimental vaccines on any human

being are not protected from liability. Are you aware that you do not enjoy such liability?

323.    Let's compare and contrast all vaccine reported adverse events in US since

1/1/2006 (15 years) verses COVID19 vaccines.

Deaths:

All vaccines 3,515

COVID19 12,366 (underreported by factor of at least 4x)

All reported adverse events:

All vaccines: 505,109 (since 1/1/2006)

COVID19: 545,338

Total permanent disabled from COVID19 injections:  14,251

324.    Therefore, between the deaths and disability we have 26,617 Americans either

dead or disabled at a MINIMUM by the vaccine.  This is neither safe nor effective.

325.    Created at "warp speed" in 9 months

326.    No long-term safety testing

327.    Emergency Use Authorization, not FDA approved (the alleged FDA approval today

still is not an approval under proper rules)

328.    Lack of trust in inconsistent government medical advice

329.    Not necessary for a virus with a 99.98% survival rate

330.    Concerns how it could affect fertility and children

331.    Concerns how it could affect pregnancy.

332.    Adverse reactions and deaths are mostly unadvertised and under-reported

333.    Personal family history of blood clots, drug reactions and strokes

334.    Natural immunity after Covid-19 infection

335.    Hidden list of unfamiliar ingredients

**336.    Lack of informed consent is unethical.  It makes no sense to claim to inform a healthcare worker of the "risks" and then not allow the healthcare worker to refuse the vaccine.**

337.    Safe and effective treatments and preventatives are available

338.    Vaccine makers cannot be sued for injury or death

339.    Moderna and Johnson & Johnson don't have history of making vaccines

340.    Pfizer, Moderna, and Johnson & Johnson all have controversial and checkered past

341.    These shots don't fit the traditional definition of a vaccine

342.    Too many conflicts of interests among vaccine experts and CEOs

343.    Marketing campaign with celebrities and incentives is too intense

344.    Media censorship of opposing medical experts is unprecedented

345.    Unjust suppression of social media reports from vaccine victims and their families

346.    "My body, my choice"

347.    The ugly history of attempts to make vaccines for the coronavirus (cold family)

348.    No access to the raw data from the vaccine trials

349.    People are catching covid after getting the vaccine

350.     The numbers for covid cases and deaths were inflated and fudged from the start by

faulty testing and reporting.

### TEN LIES BEING TOLD TO THE AMERICAN PUBLIC ABOUT COVID

351.     Lie #1:  Covid is still contagious when you're asymptomatic.

352.     Lie #2:  PCR tests tell you whether or not you have or had Covid-19 (or Delta).

353.     Lie #3:  Vaccines usually prevent you from catching Covid, or make it a mild case

if you do.

354.     Lie #4:  Covid-19 vaccines help with immunity against variants, like Delta and

Lambda.

355.     Lie #5:  A lab can test for Covid-19 and prove in court if you had it (like forensic

DNA).

356.     Lie #6:  Covid vaccines are safe, even for pregnant women.

357.     Lie #7:  Vaccine immunity is stronger than natural immunity.

358.     Lie #8:  Without vaccines, you're at high risk of catching and dying from Covid.

359.     Lie #9:  Vaccines provide better immunity for Covid than vitamin D, zinc and

ivermectin.

360.     Lie #10:  Masks, social distancing and lockdowns have helped "flatten the curve."

### FDA CLAIMED APPROVES PFIZER COVID VACCINE AUGUST 23, 2021

361.     In fact, it is a sick political ploy to try and further coerce leery healthcare workers

and Americans to obtain the vaccine.  It also comes when the Biden Administration

wants a "booster" shot.

362.     The vaccine still has not gone through normal FDA testing.

### PFIZER

363. A leaked document reveals the shocking terms of Pfizer's international COVID-19 vaccine agreements.

364. Countries that purchase Pfizer's COVID-19 shot must acknowledge that "Pfizer's efforts to develop and manufacture the Product" are "subject to significant risks and uncertainties."

365. In the event that a drug or other treatment comes out that can prevent, treat or cure COVID-19, the agreement stands, and the country must follow through with their vaccine order.

366. While COVID-19 vaccines are "free" to receive in the U.S., they're being paid for by taxpayer dollars at a rate of $19.50 per dose; Albania, the leaked contract revealed, paid $12 per dose.

367. The purchaser of Pfizer's COVID-19 vaccine must also acknowledge two facts that have largely been brushed under the rug: both their efficacy and risks are unknown.

368. Purchasers must also "indemnify, defend and hold harmless Pfizer … from and against any and all suits, claims, actions, demands, losses, damages, liabilities, settlements, penalties, fines, costs and expenses … arising out of, relating to, or resulting from the Vaccine."

369. Vaccine makers have nothing to lose by marketing their experimental COVID-19 shots, even if they cause serious injury and death, as they enjoy full indemnity against injuries occurring from COVID-19 vaccines or any other pandemic vaccine under the Public Readiness and Emergency Preparedness (PREP) Act, passed in the U.S. in 2005.

**370.     Pfizer, CDC and others are not mandating it's own employees to become vaccinated.**

371.    Karen Kingston, a former Pfizer employee, has come forward with the assertion all Covid-19 vaccines are bioweapons.

372.    There are 4 PEGylated lipid nano particles in the COVID-19 vaccines (PEG = polyethylene glycol):

   A.  a cholesterol lipid enables the vaccine ingredients to be transported by the blood

   B.  the phospholipid adheres to the cell membrane to make it permeable

   C.  an ionizable lipid provides a positive ionic charge so the mRNA can enter the cell

   D.  a PEGylated lipid made by SINOPEG, a Chinese company

373.    mRNA is very unstable, thus it needs a "biosphere" to protect it until it can enter the cell – this is provided by the lipid nano particles and graphene oxide which is 4,000 time stronger than titanium, can withstand 1,700 F temperatures, is an excellent conductor of electricity, and can host a magnetic field.

374.    Graphene oxide is not listed in the patent applications because a), it is poisonous to humans and b), because it is the main ingredient in hydrogel which can be used to create a brain-computer interface and a drug delivery system, though Kingston notes that this is not possible "with this round [of vaccines]" because "they rushed this thing out" and "they're just seeing how much they can put into people before they… die."

375.    The graphene oxide in the vaccines is neutrally charged (inactive), however if/when it becomes positively charged, such as by electromagnetic radiation (radio frequency, such as wireless devices, wireless networks such as 5G, etc.), it will annihilate anything it comes into contact with and therefore can cause great damage and death depending on how much of it exists in the body and where it is located

376.     Multiple COVID-19 "vaccines" and booster shots may increase the amount of graphene oxide in the body.

377.     The COVID-19 vaccine study should have been stopped when, during a study with mice, 80% died within 24 hours and the remainder died within the next few days.

378.     Pfizer and Children's have a study to develop the vaccine in an ongoing clinical trials, and will benefit financially if more people are required to take the shots which, until fully licensed by the U.S. Food and Drug Administration (FDA), are defined by the FDA as experimental.

379.     U.S. Senator Ron Johnson on August 26, 2021, asked the FDA about the issue of the approval not being legitimate.  **Exhibit 8**.

380.     The U.S. government and Defendants are lying about the Pfizer approval. **Exhibit 9** and **Exhibit 3**.

381.     On August 31, 2021, two top FDA officials resigned in protest.  Marion Gruber, director of the Office of Vaccines Research & Review (OURR) and Phil Krause, OVRR deputy director.

382.     The two officials are leaving the FDA in part because they are frustrated with the Centers for Disease Control and Prevention's (CDC) involvement in the vaccine approval process, as well as with White House pressure to move forward with booster vaccines for COVID-19 without FDA's approval, a former top FDA official told Endpoints.

383.     Gruber and Krause reportedly believed the CDC and its Advisory Committee on Immunization Practices (ACIP) have been too heavily involved with decisions on COVID-19 vaccines that should be left to the FDA.  They reportedly became upset with Center for Biologics Evaluation and Research (CBER) director Peter Marks, who

oversees OVRR, for not fighting harder to keep those decisions within the halls of the FDA.

384.    It makes no sense to require remote workers to receive the vaccine.

385.    Now the VA is requiring weekly testing for Covid. The tests are PCR tests which are used for DNA testing and the creator of the test states that this test should not be used for Covid testing. They are using up to 45 x replications which creates a 97% false positive rate.

386.    A VA employee stated: "If I am tested and it comes back positive (even though I am not and have no symptoms) I would have to be off work for 2 weeks and use my vacation time."

387.    On August 17, 2021, SEH had 59 Covid patients. The hospital reported 118. This is also going on in every hospital.

388.    Hospitals are demanding the vaccine to be taken from young nursing students from area colleges who must work in their hospitals for clinicals.

389.    OB/GYN groups from the hospitals refuse to write medical exemptions for their pregnant patients even when there are no studies how the vaccines might harm a child.

390.    The hospital workers are witnessing firsthand every day the vaccinated having adverse reactions.

391.    The hospitals will manipulate the Covid-19 testing on those workers who refuse to take the vaccination.

392.    Hospitals are delaying the determination of workers declination forms.

393.    Hospitals through their actions are causing patient care issues by the workers being turned against each other.

394.     The entire purpose of the vaccine is to protect the person taking it, not others.

395.     If masks work as claimed, why are workers not allowed to wear the exact same type of mask they have been wearing for a year and a half.

396.     The test uses a Q-tip with a known carcinogen, ethylene oxide.  Repeat tests expose workers to this at levels with an unknown risk.

397.     The mandate for boosters could go on and on.

398.     There is no determination between the Covid-19 virus and the flu virus.

399.     Most Covid hospitalizations are people with comorbid conditions.  Workers who are healthy, have had Covid, eat well, exercise and take care of themselves have more than enough of an immune system to defend themselves.

400.     The statistics from WHO reflect death by diabetes is a great issue than death by Covid.  It is three times more deadly.

401.     The package inserts from the vaccines are blank.

402.     If you have to persuade, remind, pressure, lie, incentivize, coerce, bully, social shame, guilty trip, threaten, punish and/or pay people to gain compliance, you can be certain what is being promoted is not in your best interest.

403.     The vaccine cards being used don't have one, but four places for shots.  Four shots planned from the beginning?

404.     These hospitals receive tax exempt status and therefore receive special treatment from the government.

405.     Local news media prepares constant puff community pieces for tristate hospitals while receiving after car sellers, the most advertising dollars.

406.     According to VAERS analysis on August 6, 2021 for through July 30, 2021:

*US Data Only

| High Level Summary | Covid-19 Vaccines Dec. 2020-Present | All Other Vaccines 1990- Present | Covid 19 Vaccines Dec. 2020-Present | All Other Vaccines 1990-Present |
|---|---|---|---|---|
| **Number of Adverse Reactions** | 571,831 | 812,603 | 451,049 | 712,541 |
| **Number of Life Threatening Events** | 13,139 | 13,383 | 7,603 | 9,546 |
| **Number of Hospitalizations** | 51,242 | 77,634 | 26,798 | 37,594 |
| **Number of Deaths** | 12,791 | 8,867 | 5,859 | 5,005 |
| **Number of Permanent Disabilities After Vaccine** | 16,044 | 18,944 | 6,654 | 11,895 |
| **Number of Office Visits** | 95,886 | 42,049 | 90,432 | 40,793 |
| **Number of Emergency Room/Dept. Visits** | 70,610 | 208,849 | 61,956 | 199,944 |

407.     Hospitals are refusing to accept responsibility for adverse reactions for vaccines.

408.     Patients who are fully vaccinated aren't being swabbed for Covid prior to procedures.

409.     The most knowledgeable segment of our community about a vaccine, healthcare workers, are resisting the vaccine.

410.     Covid 19 now has provable treatments.

411.     Hospitals are counting unvaccinated Covid admissions and death, not vaccinated.

412.     During the Covid 19 pandemic, the seasonal flu miraculously disappeared.

413.     Hospitals are refusing psychological medical exemptions.

414.    Doctors are refusing to write medical exemptions for workers who have allergies to flu vaccines.

415.    Hospitals are offering bonuses.

416.    Hospitals have been engaged and continue to be engaged in massive manipulation of Covid 19 related numbers.

417.    Hospitals have lied about how many Covid 19 patients are in their hospitals.

418.    Hospitals have lied about the number of vaccinated patients with Covid 19.

419.    Hospitals have had their physician groups hospitalize patients that should not be hospitalized.

420.    Hospitals have made false reports to state and federal agencies about their Covid 19 data.  This is criminal conduct.

421.    Hospitals have lied to the media and public to manipulate the public through fear to become vaccinated and support their hospitals.

**422.    To lie and to coerce; to manipulate; to bribe and the healthcare workers who in 2020 were HEROES to force them to take a vaccine or be FIRED, DISCHARGED, DISMISSED from not only their job, but lose their careers is the most despicable act against workers in American history.**

423.    The entire out of control vaccination campaign is predicated by the hospitals relying upon employment at will and that any employee can reject the vaccination and face discharge in lieu of vaccination.  That cannot stand in these circumstances.

424.    The U.S. government and state government has ordered these vaccinations.  But for the government mandates, there would not have to be a healthcare worker mandate.

425.     In fact, from January 1, 2020, to the present, healthcare workers took care of patients with protocols which worked just fine without the need of vaccination.

426.     The mandate does not come from the hospitals. It comes from the government who cannot force vaccinations.

427.     There is in fact a criminal conspiracy between the U.S. government, state government, media, pharma and corporate healthcare to line their pockets at the expense of the healthcare workers and American taxpayers.

428.     These entities have collaborated and conspired together to falsely report and declare information to INDUCE the American public and healthcare workers to take the vaccine.

429.     They do so knowing the adverse consequences and risks of the vaccine outweigh the benefit.

430.     They want workers who work at home to be vaccinated.

431.     They want workers who have protective antibodies to be vaccinated.

432.     They want pregnant women to be vaccinated.

433.     They want workers who are immunocompromised to be vaccinated.

434.     They want workers who have no patient contact to be vaccinated.

435.     Hospitals also have told their physician groups to deny all medical exemptions.

436.     This is an unethical and tortious interference with the healthcare of their very own workers.

437.     Hospitals have violated HIPAA in their investigation of their workers, including illegally looking at their electronic healthcare charts.

438.     Hospitals are now changing policies on an even daily basis to manipulate and threaten workers.

439.     Hospitals attempt to have healthcare workers become insubordinate so they could fire them and avoid unemployment.

440.     Hospitals have participated in clinical trials of the vaccines creating conflicts.

441.     Hospitals have changes policies on temperature and testing to reporting so workers can work sick.

442.     Those who have received the vaccination include those who did so under severe duress.

443.     The CDC and NIH have participated in the fraud upon the public with refusal to release information and misrepresenting other information.

444.     The Hospitals are causing healthcare workers to leave the field and the very collapse of healthcare system is at stake rom that- not Covid 19.

445.     Social media has perpetrated and controlled only one message on Covid, the message of Joe Biden's administration, CDC, Dr. Fauci, corporate healthcare, federal and state governments and pharma.

446.     The hospital vaccine requirement is "an affront to human dignity and personal freedom because it violates a person's basic right to control our bodies."

447.     In America's free society all people have the right to decide their own medical treatment — especially to decide what to inject into their bodies. And every person has the right to make that decision voluntarily, free from coercion by anyone, and to be fully informed of the benefits and especially the risks of that decision.

448.     The vaccine policy is a violation of the right to informed consent and the right to refuse unwanted medical treatments.

449.     This vaccine mandate undermines our Constitution and Bill of Rights by denying workers the freedom to make their own medical decisions.

450.     No one should be forced or coerced into accepting any medical procedure against their wishes. When the low risk to young adults from COVID and the known and unknown risks from the vaccines are taken into account, the hospitals' actions recklessly endanger its workers.

451.     As confirmed by the Centers for Disease Control and Prevention, young people are at minimal risk of long-term effects or death from COVID and have a 99.985% survival rate if infected with the virus.

452.     However, the most recent COVID vaccination injury update from the Vaccine Adverse Events Reporting System (VAERS) — one of the tracking systems of the U.S. Department of Health and Human Services — shows that between mid-December, 2020 and August 6, 2021, 559,040 adverse events were reported to VAERS, including 12,791 reports of deaths, many in young people ages 12 to 25.

453.     In comparison, after approximately 50 total deaths following swine flu vaccination in 1976, that vaccine campaign was immediately aborted.

454.     Unjustified fear and insatiable greed drive the vaccine industry, especially now, during the pandemic. This has created an opportunity for manufacturers to bring to market expensive, novel and patentable drugs, vaccines, biologics, treatments and medical devices that will reap huge profits.

455.    It is incredibly unnerving that the hospitals would play Russian Roulette with the

lives of the workers it claims to protect, "with greed and ties to Big Pharma being

prioritized over our safety and free will."

456.    The hospitals believe they can do what they want because the state and federal

government and media will leave them to do whatever they want.

457.    The hospitals are out of control bullies and political and criminal gangsters.

458.    The hospitals are having issues NOT because there are no beds, but because of

not enough staff caused in part by their policies.

459.    The hospitals have in their religious and medical exemptions and waivers,

releases the language including: "I want to receive the Covid 19 vaccination." This is

false.

460.    The hospitals are holding fraudulent question and answer sessions.

461.    On July 8, 2021, Secretary Xavier Becerra stated "To be clear: government has no

database tracking who is vaccinated. We're encouraging people to step up to protect

themselves, others by getting vaccinated. It's the best way to save lives and end this

pandemic." This is a lie as each state has a database and it is easily accessible to track

who has been vaccinated.

462.    The hospitals all played along with government with Covid diagnosis for

everything from a hangnail to a massive heart attack. Now they have to make you jump

through the hoop or they will have to give all the government Covid money back. The

hospital sold its soul to the devil for their corporate benefit.

463.    Providers are resuming telehealth visits, "due to increasing Covid cases." An

office does not need as many staff members since there would be minimal to no patients

coming in. if there is a mass firing due to rejecting the vaccine, they can pull office staff to cover hospital staff.

464.     The Vax-a-million, announced by Ohio Governor Mike Dewine on May 12, gave $1 million to five vaccinated adults and a college scholarship to five vaccinated youth over five weeks. The state spent about $5.6 million on the effort.

465.     Management and physicians were told they can't protest or speak up because it's against leadership and reputation.

466.     Hospitals are using contract paybacks to force vaccinations.

467.     Masks are now proven to be only a 10% protection.

468.     Covid 19 vaccines are increasing the risk of hospitalization and death.

469.     Antibody tests have been used to avoid measles, mumps and rubella vaccines.

470.     Based upon this chronology of events, the American public and well educated and trained healthcare workers (40% in the tristate believed not vaccinated by August 1, 2021) have good reason not to trust the vaccine and those who promote it.

## CRIMES COMMITTED BY DEFENDANTS

471.     Defendants have committed the following criminal offenses: healthcare fraud (18 U.S.C. 1347), false statements relating to healthcare matters (18 U.S.C. 1035), insurance fraud (R.C. 2913.47), Medicaid fraud (R.C. 2913.40), telecommunications fraud (R.C. 2913.05, criminal coercion (R.C. 2905.12), wire fraud (18 U.S.C. 1343) and mail fraud (18 U.S.C. 1341).

## CAUSES OF ACTION

### I.     VIOLATION OF THE REHABILITATION ACT AND THE AMERICANS WITH DISABILITIES ACT

472.     As set forth in all paragraphs of this Complaint, pursuant to the ADA and Rehabilitation Act, Plaintiffs and the class are qualified individuals with disabilities as defined by the ADA and Rehabilitation Act which prevent them from complying with the illegal vaccine mandate issued by the Defendants.  Plaintiffs face loss of job, career, finances, homes, and other losses based on the mandate.

473.     Defendants are covered by and are subject to the provisions of the ADA and Rehabilitation Act. Defendants must provide reasonable accommodations, including medical exemptions, to the vaccine mandate.

474.     Plaintiffs have been and are subjected to discrimination based upon their disabilities.  The Defendants have refused and are refusing to provide reasonable accommodations to Plaintiffs, including but not limited to, failing to provide enough time for Plaintiffs to seek *independent* medical treatment and advice regarding medical exemptions.

475.     In addition, Defendants have knowingly, illegally, unethically, and outrageously tampered with the medical exemption process by intimidating, threatening (directly and indirectly), "leaning on," and other means of coercion, local physicians from granting exemptions on this untested, unvetted, unverified, experimental vaccine.

476.     The actions of Defendants constitute violations of the Americans with Disabilities Act and the Rehabilitation Act of 1973.  Defendants' unlawful actions were and are intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from disability.

477.     As a direct result of the actions and conduct of Defendants, Plaintiffs are entitled

by law to a Preliminary and Permanent Injunction enjoining and restraining Defendants from enforcing in any way the Covid 19 vaccine mandate and asystematic testing. In addition, Defendants have suffered and continue to suffer all damages listed in the Prayer for Relief.

## II. VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (FAILURE TO CONSIDER/PROVIDE RELGIOUS EXEMPTIONS)

478.     As set forth in the preceding paragraphs and pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e, et seq., Defendants have unlawfully discriminated against Plaintiffs by threatening to discharge, discharging, constructively discharging, and engaging in other forms of discriminatory actions for the exercise of their religious beliefs.

479.     Plaintiffs and the Class have a bona fide and sincerely held religious belief against the Covid19 vaccines.

480.     Defendants have refused to even consider granting an exemption based upon the bona fide and sincerely held religious beliefs of the Plaintiffs. By refusing to even consider, much less grant, any religious accommodation or exemption to the Governor's COVID-19 Vaccine Mandate, Defendants have discriminated against Plaintiffs' sincerely held religious beliefs with respect to the terms, conditions, and privileges of employment.

481.     By threatening to fire Plaintiffs unless they violate their sincerely held religious beliefs and comply with the Governor's COVID-19 Vaccine Mandate, Defendants have unlawfully discriminated against Plaintiffs by discharging them or constructively discharging them for the exercise of their religious beliefs.

482.     Defendants' termination, threatened termination, denial of benefits, and other adverse employment actions against Plaintiffs are the result of Plaintiffs' exercise of their sincerely held religious beliefs.

483.     Plaintiffs sincerely held religious beliefs conflict with Defendants' policies and mandate to impose the vaccine mandate and to withhold from Plaintiffs any consideration of sincerely held religious objections.

484.     Plaintiffs and /or members of the class have all raised their sincerely held religious beliefs with their respective Defendant employers, have brought their objections and their desire for a religious accommodation and exemption to the Defendants' attention, and have requested a religious exemption and accommodation from the COVID-19 Vaccine Mandate. Moreover, any attempt would be futile as Defendants have not and will not allow any religious accommodation and exemption.

485.     Defendants' refusal to consider or grant Plaintiffs' requests for accommodation and exemption from the Defendants' COVID-19 Vaccine Mandate has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship on Plaintiffs' sincerely held religious beliefs. Plaintiffs have no adequate remedy at law for the continuing deprivation of their most cherished constitutional liberties and sincerely held religious beliefs.

### III.     PROMISSORY ESTOPPEL

486.     Defendants in 2020 told their workers there would not be a vaccine mandate.

487.     Defendant is violating their own policy of review of medical and religious exemptions.

488.     Plaintiffs, and all class members, incorporate by reference the allegations previously set forth above.

489.     Defendants repeatedly promised Plaintiffs and all class members, in late 2020 that the "Covid vaccinations would not be mandatory to continue to work at St. Elizabeth." Defendants made these representations for the purpose of inducing Plaintiffs and all class members to stay at their jobs so that Defendants could profit from Plaintiffs' all class members' continued employment utilizing their experience, talent, and long-term relationships with Defendants. Defendants knew that without those promises, Plaintiffs and all class members would take their talents and experience to other providers.

490.     Defendants, knowing Plaintiffs and all class members relied upon these promises, revoked the promises only after colluding and "circling the wagons" with the other tri-state providers so that Plaintiffs and all class members would have nowhere else to go. St. Elizabeth CEO Garren Colvin openly bragged they have nowhere else to go.  Snap the Trap Shut.

491.     Plaintiffs and all class members reasonably relied on Defendants' promises. Those representations and Plaintiffs' and all class members' reliance thereon resulted in detriment and damages to Plaintiffs and all class members which they have suffered in excess of the statutory minimum for this Court, and will continue to do so, in an amount to be determined at trial.  Plaintiffs and all class members are also entitled to injunctive relief as pled.

### IV.     VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. SECTION 1 (ILLEGAL ANTI-POACHING AGREEMENT)

492.     Plaintiffs and all class members, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in

the preceding paragraphs of this Complaint, and further allege against Defendants and each of them as follows:

493.    Defendants entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning in or about May 2021 and continuing through to the present day, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act. 121.

494.    Without the knowledge or consent of their employees, including Plaintiffs and all class members, Defendants' senior executives conspired, colluded and entered into an interconnected web of express agreements with other area providers to eliminate competition among them for skilled labor. This conspiracy included: (1) agreements to simultaneously or nearly simultaneously to impose substantially similar illegal Covid vaccine mandates upon employees to prevent employees from simply resigning and finding employment at another provider

495.    The intended and actual effect of these agreements was to fix and suppress employee mobility and illegally force, coerce, and bully employees into receiving an experimental vaccine or face loss of career, financial stability, reputation, and other losses and injuries. Defendants' conspiracy and agreements restrained trade, illegally imposed restrictions on employee mobility, and are per se unlawful under federal law.

496.    Defendants' agreements have included concerted action and undertakings among the Defendants and other area hospitals and providers with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b)

eliminating, to a substantial degree, competition among Defendants for skilled and unskilled labor, (c) imposing restrictions on employee mobility, and (d) other effects.

497.     As a direct and proximate result of Defendants' combinations, collusions, conspiracies, agreements, and contracts to restrain trade and eliminate competition for skilled and unskilled labor, members of the Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits. Plaintiffs seek injunctive relief and damages for violations of: Section 1 of the Sherman Act, 15 U.S.C. § 1.

498.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

499.     Defendants' contracts, combinations and/or conspiracies are per se violations of Section 1 of the Sherman Act. 126. Accordingly, Plaintiffs and members of the Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, injunctive relief and all damages pled in the Prayer for Relief.

**V.     VIOLATIONS OF SHERMAN ANTITRUST ACT [15 U.S.C.A. §§ 1, 26]**

500.     As alleged in this Complaint, Defendants and their co-conspirators combined, conspired, and agreed to stifle competition and fix, and illegally coerce employees to receive experimental vaccines, thereby maintaining and stabilizing to their advantage the market for employment of healthcare workers in the Tri-State area. This combination,

conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

501.　　Defendants and their co-conspirators unlawfully exercised monopoly power by threatening unlawfully to terminate employees throughout the greater Cincinnati area by acting in concert to do so. The defendants are, in concert, blackballing these employees from any employment in the greater Cincinnati area. They will never be employed again here by their concerted activity and unlawful exercise of monopoly power.

502.　　Specifically, the anticompetitive combination, conspiracy, and/or agreement alleged in this Complaint is a per se violation of the Sherman Act, 15 U.S.C.A. § 1. Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged in this Complaint resulted in substantial anticompetitive effects in the market for employment of healthcare workers in the United States in violation of the Sherman Act, 15 U.S.C.A. § 1.

503.　　Defendants intended to restrain trade and actually restrained trade in violation of Sherman Act, 15 U.S.C.A. § 1. Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing and coercing employees to undergo unwanted medical treatment by colluding and united together so that any dissenters would have no other place to work and thereby stifling competition in the market for healthcare workers.

504.　　The anticompetitive combination, conspiracy, and/or agreement alleged in this Complaint unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade. Any

alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

505.     The anticompetitive combination, conspiracy, and/or agreement alleged in this Complaint occurred within the flow of and substantially affected interstate commerce.

506.     As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiffs have been injured and will continue to be injured in its business and property by reason of Defendants' violation of the Sherman Act, 15 U.S.C.A. § 1, and are entitled to injunctive relief, costs, and attorneys' fees pursuant to the Clayton Act, 15 U.S.C.A. § 26.

507.     Unless enjoined, Defendants' anticompetitive combination, conspiracy, and/or agreement will continue.

508.     Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

509.     Plaintiffs and members of the Class seek an injunction against Defendants, preventing and restraining the Sherman Act violations alleged herein, costs, and attorneys' fees. See 15 U.S.C.A. § 26.

## VI.     INJUNCTIVE RELIEF

510.     Plaintiffs reallege and incorporate by reference all the foregoing allegations as though fully set forth herein.

511.     Pursuant to Fed. R. Civ. P. 65, and for the reasons enumerated in the Verified Complaint including Exhibits (which include a sworn Affidavit), Plaintiffs and all members of the proposed class move this Court for a preliminary injunction and temporary restraining order enjoining Defendants from forcing, ordering, and/or

requiring Plaintiffs to be vaccinated with the first shot of the Pfizer vaccine by September 1, 2021, and the second shot by October 1, 2021, and from terminating them from employment, threatening directly or indirectly in any way to terminate, or in ANY way take adverse action against any Movant and/or Plaintiffs and any member of the proposed class of this class action, including requiring said Plaintiffs to disclose action in reliance on any records including medical records until after this Motion has been heard.

512.    Unless defendants are so restrained and enjoined by order of this court, Plaintiffs will suffer immediate and irreparable injury, loss, and damage as already alleged in this motion and as more fully described and set forth in the Verified Complaint and its Exhibits filed in this action. The Plaintiffs face the immediate loss of more than their jobs. They face the immediate and irreparable damage and loss to their careers, reputations, privacy, health, and needlessly face bankruptcy, foreclosure, and other financial losses.

513.    The reasons for this Motion are detailed in the Verified Complaint and Plaintiffs reply upon same.

514.    Courts must balance four facts of when considering whether to grant a preliminary injunction. In evaluating a request for a preliminary injunction, a district court must consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction. *McNeilly v. Land* 684 F.3d 611, 615 (6th Cir. 2012) (quoting *In re Eagle-Picker Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992)).

515.     A fair trial in a fair tribunal is a basic request of due process.  Fairness of course requires an absence of actual bias in the trial of cases. *In Re Murchinso*, 349 U.S. 133, 136-137 (1955).

516.     Lastly, when Plaintiffs have shown a substantial likelihood of success on the merits, as has been demonstrated here, "no substantial harm to others can be said to inhere in its enjoinment." *Déjà vu of Nashville v. Metro Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001) (*citing Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998)).

517.     The four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied." In re Eagle-Picker Indus., Inc., 963 F.2d at 859. These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements. Northeast Ohio Coalition for the Homeless v. Husted, 696 F.3d 580 (6th Cir. 2012).

518.     When requesting the preliminary injunction, the movant need not prove the entire case. "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." Id. (quoting Six Clinic Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 402 (6th Cir. 1997) (Citation omitted)). As discussed below, these factors weigh in favor of raining a preliminary injunction here.

519.     Constitutional violations are routinely recognized as triggering irreparable harm unless they are promptly remedied. See e.g.., Elrod v. Burns, 429 U.S. 347, 373 (1976) (loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). In fact, "when an alleged deprivation of a constitutional

right is involved, most courts hold that no further showing of irreparable injury is necessary." Obergefell v. Kasich, 2013 WL 3814262, at *6 (S.D. Ohio 2013); 11A Federal Practice and Procedure Civ. §2948.1 (3d ed. & Supp.).

520.     Lastly, when Plaintiffs have shown a substantial likelihood of success on the merits, as has been demonstrated here, "no substantial harm to others can be said to inhere in its enjoinment." Déjà vu of Nashville v. Metro Gov't of Nashville, 274 F.3d 377, 400 (6th Cir. 2001) (citing Connection Distrib. Co. v. Reno, 154 F.3d 281, 288 (6th Cir.1998)).

521.     For reasons discussed above, this Court should enter an order granting Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction to enjoin Defendants as requested.

## VII.    VIOLATION OF THE RIGHT TO REFUSE UNWANTED AND MEDICALLY UNNECESSARY MEDICAL CARE

522.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

523.     The Policy requires Plaintiffs to take a vaccine without their consent, thereby depriving them of their ability to refuse unwanted medical care.

524.     The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect an individual's right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper,* 494 U.S. 210, 229 (1990).

525.     The common law baseline is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dept of Public Health*, 497 U.S.

261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery'). *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

526.     Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

527.     This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

528.     The Court has explained that the right to refuse medical care derives from the "well established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

529.     Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, because of the safety measures inherent in the hospital setting and because some of those employees already possess natural immunity to the virus, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments protect.

530.     When a policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard "applies [;] a law will not be upheld unless the government

demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

531.    Defendants cannot show that they have a compelling interest in coercing Plaintiffs into taking a COVID-19 vaccine, because by the nature of their employment, Plaintiffs already use all the tools available to prevent the spreading of infections, Covid-19 in particular.

532.    The CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people. That further underscores the arbitrary nature of the Policy. [26]

533.     Likewise, recent data from Israel suggest that individuals who receive the Pfizer Vaccine can pass the virus onto others a mere few months after receiving it. Yet, as of the writing of this Complaint, the CDC is not requiring booster shots.[27]

534.    Even if Defendants could show a compelling interest in mandating vaccination, the Policy is not narrowly tailored to achieve such an interest. It ignores individual factors increasing (age, co-morbidity) or decreasing (having recovered from Covid) employees risks to themselves or others.

535.    Had a vaccine been available then, such a blanket mandate may have appropriate when little was known at the beginning of the pandemic, but not when health safety measures have proven effective to reduce contamination and much is left unknow about the risks of the vaccines.

---

[26] Where's the data? WASHINGTON POST (July 28, 2021), available at wapo.st/2THpmIQ (last visited August 12, 2021).

[27] Joint CDC and FDA Statement on Vaccine Boosters | HHS.gov (last visited August 12, 2021).

536.     The Policy forces Plaintiffs to choose between their health, their personal autonomy, and their careers.

537.     Plaintiffs will suffer damage from Defendants' conduct. There is no adequate remedy at law, as there are no damages that could compensate Plaintiffs for the deprivation of their constitutional rights. They will suffer irreparable harm unless this Court enjoins Defendants from enforcing their Policy.

538.     Plaintiffs are entitled to a judgment declaring that the Policy violates their constitutional right to refuse medical treatment and an injunction restraining Defendants' enforcement of the Policy.

## VIII.   CRIMINAL COERCION

539.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

540.     Plaintiffs have the legal right to refuse to receive the Covid-19 vaccine.

541.     Defendants acted with the intent to compel Plaintiffs to receive the Covid-19 vaccine with the threat of both termination and the subsequent impairment to the Plaintiffs' reputations in the medical field.

542.     The Defendants threatened Plaintiffs that unless they receive the Covid-19 "vaccine," their employment would be subsequently terminated.

543.     The Defendants knew that by singling out any employee whom had not received the vaccine, employees would be compelled to "comply" under the threatening pressure of being a virtual outcast amongst their colleagues.

544.     Defendants utilized the threat of being ostracized against its own physicians/employees to coerce them into "complying" and getting the Covid-19 "vaccine."

545.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

546.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

547.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

548.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## IX.     FRAUD IN THE CONCEALMENT AND CONSTRUCTIVE FRAUD

549.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

550.     The misrepresentations and/or concealments were made during Defendants' communications with Plaintiffs.

551.     Defendants were fully aware and/or recklessly ignored the inaccuracy of both the internal and external reporting regarding the Covid-19 numbers. These numbers include, but are not limited to;

        a.   Covid-19 infection rates for the vaccinated/ unvaccinated,

        b.   Covid-19 death rates for the vaccinate/ unvaccinated,

    c.   ICU bed occupancy attributable to vaccinated vs. non-vaccinated patients,

    d.   Covid-19 vaccine adverse effects,

552.    Defendants willfully concealed, covered up, destroyed, willfully and/or recklessly ignored the obvious evidence which, unfortunately for the Defendants, was contrary to the Defendant Hospitals' intended narrative.

553.    Defendants directly and indirectly, orally, and in writing, threatened, coerced, and pressured Plaintiffs to not discuss, disclose, or reveal evidence of the "reality" of Covid-19 and the Covid-19 vaccine and its impact on the general population.

554.    Defendant Hospitals had a monetary interest in concealing the truth.

555.    As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

556.    Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

557.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

558.    Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## X.    TORTIOUS INTERFERENCE WITH PERSONAL HEALTHCARE

559.    The Defendants have unilaterally declared there will be no medical exemptions and have ordered their physician groups to NOT grant medical exemptions no matter the facts. This is evil, criminal and actionable.

## XI.    FRAUDULENT INDUCEMENT

560.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

**561.**    Even though they are aware of the potential serious risks associated with Covid vaccines, in order to induce Plaintiffs to get vaccinated, Defendants have concealed those risks and misrepresented the benefits.

**562.**    In fact, the newness of these vaccines and the fact that so little is known as of yet about the risks associated with them makes it impossible for Defendants to comply with their duty to disclose the risks and benefits associated with them

**563.**    The safety and benefits of a vaccine are representations that are material to the decision of a person to get such vaccine.

**564.**    Plaintiffs relied and WILL continue to rely on Defendants' concealment. Had all the risks and lack of benefits (specifically for those Plaintiffs who have recovered from Covid-19) been disclosed (if they even could), Plaintiffs would not take or have taken the vaccines.

**565.**    Plaintiffs have been and will continue to be harmed by Defendants' concealment in that they were, are and will be forced, to undergo a procedure that they would not have wanted or do not want.

**566.**    Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

**567.**     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## XII.    CIVIL AND CRIMINAL CONSPIRACY

568.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

569.     Defendants acted in concert – conspired-  in imposing the vaccine mandate and forcing Plaintiffs to choose between their job or their health.

570.     Defendants' scheme seeks to achieve an illegal goal – the imposition of a vaccine that is experimental and in violation of Plaintiff's constitutional rights.

571.     Defendants' actions are not reasonable in that they are not necessary to achieve the goal of limiting the spread of the Covid-19 vaccine.

572.     Because of Defendants' concerted actions, Plaintiffs who do not want the vaccine will not be able to work in other hospitals. Therefore, there is no meaningful choices for affected Plaintiffs in their field of employment.

573.     Defendants are in fact taking away Plaintiffs' livelihood.

**574.**     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

**575.**     Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

576.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless condition surrounding Plaintiffs' termination.

## XIII.    CIVIL LIABILITY FOR CRIMINAL CONDUCT  KY "PENALTY NO BAR TO CIVIL RECOVERY" (KY. REV. STAT. ANN. § 446.070/ OH "CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACT" (O.R.C. § 2307.60)

577.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

578.    Plaintiffs have been injured by the violation of all of the preceding and/or following statutes.

579.    Consequently, Plaintiffs are entitled to such damages that have been sustained by reason of the violation per (statute).

580.    As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

581.    Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

582.    Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

583.    Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XIV.    VIOLATION OF AT-WILL EMPLOYMENT DOCTRINE/PUBLIC POLICY EXCEPTION

**584.** Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

**585.** Defendants' Policy is in direct violation of Federal law, specifically 21 U.S. Code § 360bbb-3 – Authorization for medical products for use in emergencies.

**586.** That law states that where a medical product is "unapproved" then no one may be mandated to take it. At Section (e)(1)(A) of the aforementioned statute it states:

With respect to the emergency use of an unapproved product, the Secretary, to the extent practicable given the applicable circumstances described in subsection (b)(1), shall, for a person who carries out any activity for which the authorization is issued, establish such conditions on an authorization under this section as the Secretary finds necessary or appropriate to protect the public health, including the following: (i) Appropriate conditions designed to ensure that the health care professionals administering the product are informed – (ii) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and (iii) of the alternatives to the product that are available, and of their benefits and risks. (iv) Appropriate conditions designed to ensure that individuals to whom the product is administered are informed— (v) that the Secretary has authorized the emergency use of the product; (vi) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and (vii) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." (emphasis added).

587.     Defendants violated at least two quoted sections (ii and iii). Defendants did not advise Plaintiffs of the "known and potential benefits and risks of such emergency use of the product, and of the extent to which such benefits and risks are unknown" of the COVID-19 experimental vaccine. Additionally, Plaintiffs are not provided "the option to accept or refuse administration of the…" experimental vaccine as a condition for employment. Such conduct is in violation of the public policy of this state and is the basis for an exception to the at-will employment doctrine.

588.     It is questionable for Defendants to require its employees to take the emergency experimental vaccine at this stage of the pandemic where so many people are vaccinated and/or have recovered from vaccines and where Plaintiffs evolved in an environment where protective measures in place where deemed sufficient to prevent the spread of the disease prior to the EUA of the vaccines.

589.     Defendants' Policy is also in direct violation of Plaintiffs' right to receive unwanted and unnecessary medical care as afforded by the Ninth and Fourteenth Amendments protecting an individual's right to privacy.

590.     Plaintiffs suffered damages in an amount in an amount to be determined at trial.

591.     Defendants' wrongful acts have caused injury to Plaintiffs. Plaintiffs have suffered lost wages, loss of earnings capacity, lost benefits, lost future earnings, mental anguish, inconvenience, and loss of enjoyment of life as a direct result of Defendants' unlawful actions against them.

592.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendants' malicious, reckless conduct.

## XV.    BREACH OF FIDUCIARY DUTY AND NEGLIGENCE

593.      Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

594.      Based upon all facts pled and to be proven, Defendants had a fiduciary duty by their position to protect Plaintiffs and were in positions of responsibility and trust.

595.      As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

596.      Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

597.      Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

598.      Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XVI.   DURESS

599.      Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

600.      Defendants created the illusory choice Plaintiffs to choose whether or not to receive the Covid-19 vaccine.

601.      Defendants forced employees to comply and receive the Covid-19 vaccine.

602.      Defendants are forcing Plaintiffs to receive the Covid-19 vaccine under economic duress.

603.     As a result, Plaintiffs have suffered and will continue to suffer damages in an amount in an amount to be determined at trial.

604.     Defendants' wrongful acts have caused injury to Plaintiffs including stress, mental and physical pain and suffering, mental anguish, inconvenience, and loss of enjoyment of life.

605.     Plaintiffs suffered these injuries as the result of Defendants' actions and in all reasonable probability will continue to suffer these injuries in the future. Plaintiffs also seek punitive damages as the result of Defendant Hospitals' malicious, reckless conduct.

606.     Plaintiffs are also entitled to recover treble damages as a result of Defendant Hospitals' concerted actions.

## XVII.  DECLARATORY RELIEF

**607.**     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

**608.**     Plaintiffs request the Court issue declaratory relief that (a.) 21 U.S. Code § 360bbb-3, Section (e)(1)(A) does not permit Defendants to coerce an employee to accept an FDA vaccine on penalty of termination or other sanctions. (b.) The doctrine of federal preemption invalidates and voids the Policy of each of Defendants.

**609.**     Accordingly, Plaintiffs request a declaration that each of Defendants' above-Policy is invalid.

## XVIII. INJUNCTIVE RELIEF

610.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

611.     Plaintiffs have been threatened for choosing not to take an FDA unapproved experimental vaccine which federal law states cannot be mandated because insufficient trials have been conducted and its long-term effects are not known. Currently there are many new reports of adverse effects and even deaths resulting from the experimental vaccine. Plaintiffs might be terminated for refusing to take an experimental vaccine which federal law states cannot be mandated, constitutes a retaliatory discharge under Ohio/Kentucky law and a violation of their constitutional right under the Ninth and Fourteenth Amendment of the United States Constitution.

612.     "The purpose of a preliminary injunction is simply to preserve the status quo[,]" *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004), *i.e.*, "to preserve the parties' relative positions in order to prevent irreparable injury prior to trial." *Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993).

613.     Irreparable injury to the Plaintiffs will result from their being obligated to take the vaccine or be terminated.

614.     Therefore, Plaintiffs respectfully request this Court issue a temporary injunction, after notice and hearing, restraining the Defendants, their agents, representatives, or anyone acting on their behalf until further order of the Court from requiring them be vaccinated or terminating Plaintiffs for the sole reason of their refusal to be vaccinated.

### XIX.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

615.     Defendants' conduct as described above was intentional and reckless.

616.     Defendants' behavior is outrageous and offends against the generally accepted standards of morality.

617.     It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

618.     Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## XX.     VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND THE FOURTEENTH AMENDMENT'S RIGHT TO DUE PROCESS

619.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

620.     These claims are admittedly made as an extension of existing law or new law. Government controls the hospitals.

621.     Unconstitutional conditions case law often references the existence of varying degrees of coercion. According to that body of law, Defendant cannot impair Plaintiffs' right to refuse medical care through subtle forms of coercion any more than it could through an explicit mandate. See, e.g., Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); Memorial Hosp. v. Maricopa Cty., 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up").

622.     The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law … ." U.S. Const., amend. XIV, sec. 1.

623.     Plaintiffs possesses both a liberty interest in his bodily integrity.

624.     It is less appreciated in legal circles that, to prevail, unconstitutional conditions claims do not need to establish that a challenged government policy amounts to coercion.

Instead, it is sufficient that the state policy burden a constitutional right by imposing undue pressure on an otherwise voluntary choice with a nexus to the exercise of a constitutional right. In other words, the presence of some remaining voluntarism after new conditions are imposed on the exercise of a constitutional right does not stand as a barrier to establishing successful unconstitutional conditions claim. This is especially true when a government actor couples an unconstitutional condition with a procedural system stacked against the right-holder.

625.     For example, in Speiser v. Randall, 357 U.S. 513 (1958), the Court invalidated a loyalty oath imposed as a condition for veterans to obtain a state property tax exemption, even though (a) California citizens were not required to own real property, of course; (b) California veterans could freely opt not to seek the exemption and simply pay the unadorned tax; and (c) California was not even obligated to provide veterans with the exemption but rather the exemption was a mere privilege.

626.     The Speiser Court deemed the oath condition unconstitutional in part because the burden to establish qualification for the exemption was placed on applicants. See id. at 522. The question the Supreme Court saw itself deciding was "whether this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." Id. at 523.

627.     The Court addressed this question by stating the guiding principle that

> Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance …. [But] Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt.

> Id. at 525-26.

628.     Here, the analogue of the criminal defendant rights of "transcending value" referenced in Speiser are the liberty rights of all persons to be free of unconsented-to bodily intrusions and medical interventions. This means that unconstitutional conditions doctrine and due process rights combine to invalidate the Policy. That result occurs because Defendants have not and cannot show that the school's forcing Plaintiffs to take the vaccine reduces any risk that he will become infected with and spread the virus. See also Lawrence v. Texas, 539 U.S. 558, 562 (2003) (The Due Process Clause protects "liberty of the person both in its spatial and in its more transcendent dimensions").

629.     Similar to the California law in Speiser "creat[ing] the danger that … legitimate utterance will be penalized," 357 U.S. at 526, the process Defendants have established in relation to taking COVID-19 vaccines poses dangers to Plaintiffs' health (and thus to their liberty interests) as well as threatening their with various forms of penalties and other detriments.

630.     Indeed, more so than in Speiser, the factual issues involved in this case are complex. "How can a claimant … possibly sustain the burden of proving the negative of these complex factual elements? In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly." Id. There is perhaps no better encapsulation by the Supreme Court of how unconstitutional conditions doctrine and Due Process can and do intersect and reinforce one another. See also id. at 529 ("The State clearly has no such compelling interest at stake as to justify a short-cut procedure which must inevitably result in suppressing protected speech."). The Commonwealth of Kentucky similarly possesses no compelling interest that could justify

its defective Policy that will inevitably result in at least some unwarranted medical intrusions into the bodies of members of the Defendants community.

631.     For these reasons, Defendants cannot by means of its Policy effectively flip the burden of proof and require Plaintiffs to prove that it is safe for him to work without being vaccinated. And setting up such a process, which is what Defendant's Policy does, thereby represents a concurrent procedural due process violation and an unconstitutional condition burdening his liberty interests to be free of unwanted medical interventions.

632.     Speiser also rests on the mismatch between the loyalty oath California required and the grant of a property tax exemption to veterans. "[T]he State is powerless to erase the service which the veteran has rendered his country; though he be denied a tax exemption, he remains a veteran." Id. at 528. 36.

## XXI.   VIOLATION OF THE SUPREMACY CLAUSE

633.     Plaintiff realleges and incorporates by reference all the foregoing allegations as though fully set forth herein.

634.     Defendants' Policy requires Plaintiffs to receive a vaccine in order to work effectively without regard to their natural immunity or the health risks they face.

635.     They also must divulge personal medical information by uploading it into an online portal and is threatened with disciplinary action if he declines to comply with these arbitrary mandates.

636.     The Policy thus coerces or, at the very least, unduly pressures Plaintiffs into getting a vaccine that FDA approved only for emergency use.

637.     The United States Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state. U.S. Const. art. VI, cl. 2.

112

638.     "State law is pre-empted to the extent that it actually conflicts with federal law."

English v. General Elec. Co., 496 U.S. 72, 79 (1990) (internal citations and quotation marks

omitted).

639.     Federal law need not contain an express statement of intent to preempt state law for

a court to find any conflicting state action invalid under the Supremacy Clause. See Geier

v. American Honda, 520 U.S. 861, 867-68 (2000).

640.     Rather, federal law preempts any state law that creates "an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." Arizona

v. United States, 567 U.S. 387, 399-400 (2012).

641.     The EUA statute mandates informed and voluntary consent. See John Doe No. 1 v.

Rumsfeld, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005)

(allowing use of anthrax vaccine pursuant to EUA "on a voluntary basis"). See also 21

U.S.C. § 360bbb3(e)(1)(A)(ii).

642.     It expressly states that recipients of products approved for use under it be informed

of the "option to accept or refuse administration," and of the "significant known and

potential benefits and risks of such use, and of the extent to which such benefits and risks

are unknown." Id.

643.     Since Defendants' Policy coerces Plaintiffs by making enjoyment of their

constitutionally and statutorily protected consent rights contingent upon receiving an

experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute.

See 21 U.S.C. § 360bbb-3.

644.     The conflict between the Policy and the EUA statute is particularly stark given that

the statute's informed consent language requires that recipients be given the "option to

refuse" the EUA product. That is at odds with the Policy's forcing Plaintiffs to sustain significant injury to their career if they do not want to take the vaccine (in light of masking, frequent testing, social distancing, and looming disciplinary action).

645. Put differently, the Policy frustrates the objectives of the EUA process. See Geier, 520 U.S. at 873 (citing Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

646. As noted above, OLC made a memorandum available to the public on July 27, 2021 (dated July 6, 2021) opining that the EUA status of a medical product does not preclude vaccine mandates that might be imposed by either the public or private sectors. See "Memorandum Opinion for the Deputy Counsel to the President," Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization (July 6, 2021) (OLC Op.) at 7-13, available at https://www.justice.gov/olc/file/1415446/download (last visited Aug.1, 2021).

647. Of course, the separation of powers dictates that this Court is not bound by the OLC Opinion—an advisory opinion written by the Executive Branch for the Executive Branch. See Citizens for Responsibility & Ethics in Wash. v. Office of Admin., 249 F.R.D. 1 (D.C. Cir. 2008) ("OLC opinions are not binding on the courts[; though] they are binding on the executive branch until withdrawn by the Attorney General or overruled by the courts[.]") (cleaned up).

648. Relatedly, the Justice Department until only days ago took a very different approach. See Attorney General Memorandum, Balancing Public Safety with the Preservation of Civil Rights (Apr. 27, 2020), available at https://www.justice.gov/opa/page/ file/1271456/download (last visited Aug. 1, 2021, 2021) ("If a state or local ordinance crosses the line from an appropriate exercise of

authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court."). See also Kevin Liptak, CNN, Biden Jumps Into Vaccine Mandate Debate as VA Requires Health Workers to Get Vaccinated (July 26, 2021) ("The [new OLC] opinion marks a reversal from the previous administration. Last year, Attorney General William Barr used the Justice Department's legal power to try to fight certain Covid restrictions, including joining some businesses that sought to overturn state mask mandates."), available at cnn.it/37bwAbl (last visited Aug. 1, 2021).

649.     Moreover, the OLC Opinion is entirely silent on the issue of preemption. As such, it cannot be read even as offering a potentially persuasive legal view on whether the Defendant Policy is preempted by the EUA statute or not. In light of what this Count pleads, the OLC opinion is a legal non sequitur.

650.     The OLC Opinion is also premised on faulty reasoning. While recognizing that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," the Opinion nevertheless maintains that the EUA vaccines can be mandated. OLC Op. at 3-4, 7.

651.     According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine. All that an administrator must do, in OLC's view, is tell the recipient they have the option to refuse the vaccine. Id. at 7-13.[28] That facile interpretation sidesteps the fact

___

[28] The OLC opinion is as irrelevant to the constitutional questions in this case posed by Counts I and II as it is to the preemption questions in Count III. For it was no answer in Speiser to the due process and unconstitutional conditions problems created by California's property tax exemption and oath system to quickly breathe a sigh of relief because California tax authorities could simply tell veterans applying for the tax exemption that they could

that the Policy's employment consequences effectively coerce or at least unconstitutionally leverage the community into taking the vaccine, reducing to nothingness both the constitutional and statutory rights of informed consent. This approach of stating the obvious but ignoring competing arguments is likely why the Opinion remained mum on the doctrine of preemption.

652.     Recognizing the illogic of the Opinion and its inability to square its construction with the text of the EUA statute, OLC admits that its "reading … does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have 'the option to accept or refuse' the product." Id. at 10. This understatement would be droll but for the serious rights at stake, especially given that the elephant in the room—which the OLC Opinion ignores—is the Supremacy Clause and the preemption doctrine that Clause powers. In truth, Congress called for potential users to be informed precisely so that they could refuse to receive an EUA product. OLC's obtuse reading of the statute blinks reality.

653.     In other words, nothing in the OLC Opinion addresses the fact that if it were taken as a blanket authorization for state and local governments to impose vaccine mandates, a vital portion of the EUA statute's text would be rendered superfluous. See, e.g., TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

654.     Yet, OLC turns around and claims that Congress would have explicitly stated if it intended to prohibit mandates for EUA products. Id. at 8-9. But Congress did say so. The

just go away and forgo the tax exemption. The Constitution and the text of congressional statutes cannot be so easily dodged.

plain language states that the recipient of an EUA vaccine must be informed "of the option to accept or refuse the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). Especially when read against the backdrop of what the Constitution requires and against the common law rules from which the constitutional protections for informed consent arose, Congress's intent to protect informed consent is pellucid. And Congress "is understood to legislate against a background of commonlaw … principles," Astoria Fed. Sav. & Loan Assn. v. Solimino, 501 U.S. 104, 108 (1991).

655.     The EUA statute's prohibition on mandating EUA products is reinforced by a corresponding provision that allows the President, in writing, to waive the option of those in the U.S. military to accept or refuse an EUA product if national security so requires. 10 U.S.C. § 1107a(a)(1). That provision would be redundant if consent could be circumvented merely by telling a vaccine recipient that he or she is free to refuse the vaccine but would nonetheless encounter various adverse consequences that violated unconstitutional conditions doctrine.

656.     To circumvent the statutory text about the military waiver, OLC spins out a tortured argument under which the President's waiver would merely deprive military members of their rights to know that they can refuse the EUA product—rather than waiving their rights to actually refuse the product. OLC Op. at 14-15.

657.     Unsurprisingly, OLC's strained reading runs counter the Department of Defense's understanding of this statutory provision. As the OLC Opinion acknowledges, "DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to

refuse, unless the President exercises the waiver authority contained in section 1107a." Id. at 16 (citing DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008)).

658.  OLC even acknowledges that its opinion is belied by the congressional conference report, which also contemplated that 10 U.S.C. § 1107a(a)(1) "would authorize the President to waive the right of service members to refuse administration of a product if the President determines, in writing, that affording service members the right to refuse a product is not feasible[.]" Id. (quoting H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.)).

659.  Unlike OLC, this Court must not ignore the plain statutory prohibition on mandating EUA products. Though released to much fanfare in the media, the Court should discount the severely flawed OLC Opinion in its entirety, affording it no weight in this litigation.

660.  Just as Congress prohibited the federal government from mandating EUA products, the state governments cannot do so, for the Supremacy Clause dictates that the EUA statute must prevail over conflicting state law or policy.

661.  Defendants' Policy is thus preempted by federal law. See U.S. Const. art. VI, cl. 2; see also Kindred Nursing Ctrs. Ltd P'ship v. Clark, 137 S. Ct. 1421 (2017) (holding that Federal Arbitration Act preempted incompatible state rule); Hughes v. Talen Energy Marketing, LLC, 136 S. Ct. 1288, 1297 (2016) ("federal law preempts contrary state law," so "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" the state law cannot survive).

662.  Defendants' Policy is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

## XXII.  NUREMBERG CODE OF 1947

663.    The right to avoid the imposition of human experimentation is fundamental, rooted in the Nuremberg Code of 1947, has been ratified by the 1964 Declaration of Helsinki and further codified in the United States Code of Federal Regulations.  In addition to the United States regarding itself as bound by these provisions, these principles were adopted by the FDA in its regulations requiring the informed consent of human subjects for medical research.  It is unlawful to conduct medical research, even in the case of an emergency, unless steps are taken to secure informed consent of all participants.

## XXIII. 28 U.S.C § 1983 CLAIM

664.    Defendants' conduct as described in the Complaint supports a claim under Section 28 U.S.C. § 1983.

## XXIV. ATTORNEYS FEES

665.     Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

666.    Plaintiffs request this Court award them their reasonable and necessary attorney fees and costs incurred in prosecuting this action.

**WHEREFORE**, Plaintiffs respectfully request that the court:

1.  A declaratory judgment that each of Defendants' Policy infringes upon Plaintiffs constitutionally protected rights to protect their bodily integrity and to refuse unnecessary medical treatment;

2.  Judgment in favor of Plaintiffs and an award to Plaintiffs of compensatory, all actual, exemplary, special, and statutory, treble and consequential, damages, including interest, in an amount to be proven at trial;

3. A declaratory judgment that each of Defendants' Policy is invalid under 21 U.S. Code § 360bbb-3, Section (e)(1)(A);

4. A declaratory judgment that each of Defendants' Policy is in violation of public policy;

5. An award of their reasonable and necessary attorneys' fees and costs incurred in prosecuting this action; and

6. Schedule this matter for a temporary injunction hearing enjoining the Defendants from terminating, demoting, or taking any negative action against Plaintiffs for refusing to take a mandatory vaccine and blocking discriminatory testing and any other relief to which the Plaintiffs may show themselves entitled.

7. All other review to which they are entitled, including a jury trial.

Respectfully submitted,


/s/ Glenn D. Feagan_____
Deters Law
5247 Madison Pike
Independence, Kentucky 41051
859-363-1900
gfeagan@feaganlaw.com


## JURY DEMAND

Plaintiff make a demand for a jury under all claims.


/s/ Glenn D. Feagan_____
Glenn D. Feagan (#0041520)